**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR WHEATLAND BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 10 CV 4288 *Consolidated with* |
| v. | ) ) | Case No. 10 CV 4687 |
| LEWIS MARK SPANGLER, ARTHUR P. SUNDRY, JR., MICHAEL A. SYKES, LEONARD EICHAS, FRANK MALY, DOLORES RITTER, MARY DAVOLT, BEVERLY HARVEY, MICHAEL REES, and NORMAN BELES | ) ) ) ) ) ) ) ) | Hon. William T. Hart  JURY TRIAL REQUESTED |
| Defendants. | ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation, as Receiver for Wheatland Bank ("FDIC"), for its First Amended Complaint states as follows:

## I.    INTRODUCTION

1.    The FDIC brings this lawsuit in its capacity as Receiver for Wheatland Bank ("Wheatland" or the "Bank") to recover over $22 million in losses the Bank suffered on certain commercial real estate ("CRE") loans, including acquisition, development, and construction ("ADC") loans, and one line of credit (collectively, "Loss Loans").

2.    Wheatland began operations in February 2007 and closed in April 2010. The Bank was based in Naperville, Illinois, and had no branches, holding company, or affiliates.

3.    The FDIC asserts claims against ten former officers and directors of the Bank ("Defendants") for gross negligence, negligence, breach of the fiduciary duty of care, breach of the fiduciary duty of loyalty and failure to supervise. Six of the Defendants were members of the

Bank's loan committee ("Loan Committee"), which was responsible for approving the Loss Loans. Four of the Defendants were members of the Board of Directors, but did not serve on the Loan Committee.

4.        Defendants recklessly implemented an unsustainable business model pursuing rapid asset growth concentrated in high-risk CRE loans without having adequate loan underwriting and credit administration practices to manage the risk. To make matters worse, the Bank routinely violated whatever loan policies it had in place and approved loans that had little chance of repayment. The Bank also made loans to favored shareholders and borrowers on terms that were preferential and abusive and then, after default, failed to pursue the borrowers and guarantors on these loans. Regulatory warnings about the Bank's reckless lending practices were repeatedly ignored by Defendants. The out-of-control lending continued until the Bank was closed after only about three years in operation.

## II.        **PARTIES**

5.        Plaintiff, the FDIC, is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. § 1811, *et seq*. The FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed financial institutions. 12 U.S.C. § 1821(d). Wheatland was a state nonmember bank organized under the laws of the State of Illinois, and its deposits were insured by the FDIC. On April 23, 2010, the Illinois Department of Financial and Professional Regulation ("IDFPR") closed Wheatland and appointed the FDIC as Receiver. Pursuant to 12 U.S.C. § 1821d(2)(A)(i), the FDIC as Receiver succeeded to all rights, titles, powers, and privileges of Wheatland and its shareholders including, but not limited to, Wheatland's claims against the Bank's former officers and directors for negligence, gross negligence, breach of fiduciary duty of care, breach of the

fiduciary duty of loyalty, and failure to supervise the operations of the Bank.

## Loan Committee Defendants

6. Defendant Lewis Mark Spangler ("Spangler") was the Chairman of the Board of Directors and a member of the Loan Committee from February 2007 to April 2010. As a Loan Committee member, Spangler voted to approve seven of the eight Loss Loans. Spangler owned or controlled more than 125,000 shares of common stock of the Bank.

7. Defendant Michael A. Sykes ("Sykes") was the President and Chief Executive Officer of the Bank from February 2007 to June 2009. Sykes also was a member of the Board of Directors and the Loan Committee. As a Loan Committee member, Sykes voted to approve all eight Loss Loans. Sykes owned or controlled more than 100,000 shares of common stock of the Bank.

8. Defendant Arthur P. Sundry, Jr. ("Sundry") was a member of the Board of Directors from February 2007 to July 2009. Sundry also was a member of the Loan Committee. As a Loan Committee member, Sundry voted to approve seven of the eight Loss Loans. Sundry owned or controlled more than 71,000 shares of common stock of the Bank.

9. Defendant Leonard Eichas ("Eichas") was the Chief Lending Officer ("CLO") of the Bank from February 2007 to June 2009. As CLO, Eichas was responsible for the lending activities of the Bank. As a Loan Committee member, Eichas voted to approve all eight Loss Loans. Eichas owned or controlled more than 60,000 shares of common stock of the Bank.

10. Defendant Frank Maly ("Maly") was a member of the Board of Directors from June 2007 to April 2010. Maly also was a member of the Loan Committee. As a Loan Committee member, Maly voted to approve five of the eight Loss Loans. Maly owned or controlled 129,000 shares of common stock of the Bank.

11.     Defendant Dolores Ritter ("Ritter") was the Chief Financial Officer of the Bank from February 2007 to December 2008.  Ritter also was a member of the Loan Committee.  As a Loan Committee member, Ritter voted to approve one of the eight Loss Loans.  Ritter owned 1,000 shares of common stock of the Bank.

12.     Defendants Spangler, Sykes, Sundry, Eichas, Maly, and Ritter collectively are referred to as the "Loan Committee Defendants."

### Outside Director Defendants

13.     Defendant Michael Rees ("Rees") was a member of the Board of Directors from February 2007 to January 2008 and from November 2009 to April 2010.  Rees owned or controlled 5,000 shares of common stock of the Bank.

14.     Defendant Mary Davolt ("Davolt") was a member of the Board of Directors from March 2007 to September 2009.  Davolt regularly attended meetings of the Loan Committee as a non-voting observer.  Davolt owned 8,400 shares of common stock of the Bank.

15.     Defendant Norman Beles ("Beles") was a member of the Board of Directors from June 2007 to August 2008 and from July 2009 to February 2010.  Beles owned or controlled 25,000 shares of common stock of the Bank.

16.     Defendant Beverly Harvey ("Harvey") was a member of the Board of Directors from January 2008 to April 2010.  Harvey owned or controlled 236,000 shares of common stock of the Bank.

17.     Defendants Rees, Davolt, Beles, and Harvey collectively are referred to as the "Outside Director Defendants."

18.     The Outside Director Defendants were not members of the Loan Committee.

19.     Defendants Spangler, Sykes, Sundry, Maly, Rees, Davolt, Beles, and Harvey

collectively are referred to as the "Director Defendants."

## III.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

22.    This Court has personal jurisdiction over Defendants pursuant to 735 ILCS § 5/2-209, *et seq.*

## IV.    FACTUAL BACKGROUND

### A.    Wheatland and Its Collapse

23.    Wheatland opened for business on February 5, 2007.  From the outset, the Bank adopted an aggressive and reckless asset growth strategy that violated its own business plan that it had submitted to obtain its deposit insurance.  After only six months in operation, the Bank's total assets reached levels not projected in the business plan until the second quarter of the second year of operation.

24.    By the end of the second year of operation, the Bank had $401 million in loans, which was almost five times the amount promised in the business plan provided to state and federal regulators.  Rapid loan growth compromised credit underwriting and credit administration, which eventually led to loan losses that depleted the Bank's capital.

25.    Defendants increased the Bank's high-risk exposure by failing to implement prudent underwriting, risk management and credit administration practices, by failing to follow the Bank's written loan policies, and by failing to properly supervise, manage, and oversee the Bank's lending operations.

26.    Defendants did not control and properly monitor the Bank's concentration of CRE and ADC loans.  Excessive CRE loan concentrations left the Bank particularly vulnerable

to the downturn in the real estate market. Examiners warned that, as of June 30, 2007, CRE lending represented the largest share of the Bank's loans with a concentration totaling 226 percent of total capital. ADC loans, in particular, represented 143 percent of total capital. By the end of 2008, CRE lending was 706 percent of total capital and ADC loans were 306 percent of total capital.

27. The Bank's percentage of CRE loans to total capital exceeded that of its peer group by very large margins.



28. The Bank's percentage of ADC loans to total capital also was significantly higher than that of its peer group.



29.     In addition, as of December 31, 2008, ten individuals were obligated on loans that represented 97 percent of total capital. Seven of these large borrowers had credits that were designated for Special Mention or otherwise adversely classified by examiners.

30.     Examiners repeatedly warned Defendants of the increasing risks posed by its excessive growth, heavily concentrated loan portfolio, poor underwriting, and lax oversight and control of the Bank's lending operations. Defendants ignored these warnings. Instead, the Bank continued to focus on asset growth rather than risk diversification and credit quality, increased its CRE concentrations to unacceptable and unsafe levels, and failed to underwrite properly its loans.

31.     On April 23, 2010, the IDFPR closed Wheatland and appointed the FDIC as Receiver of the Bank. Wheatland failed with assets of $441.6 million and a loss to the Deposit Insurance Fund currently estimated at $136.9 million.

B.      **Defendants Ignored Regulatory Warnings**

32.     Between 2007 and 2010, the FDIC and IDFPR jointly and separately conducted four full-scope safety and soundness examinations and one visitation.  The regulators repeatedly warned Defendants about the Bank's excessive asset growth, overconcentration of CRE loans, inadequate credit underwriting, deficient credit administration, and failure to supervise adequately the operation of the Bank.  These warnings were ignored by Defendants.

33.     In the August 2007 Report of Examination ("RoE"), the IDFPR warned Defendants about the Bank's excessive asset growth rate, high concentration of CRE and ADC loans, violations of loan to value ("LTV") ratio guidelines, and poor earnings.  The examiners urged Defendants to monitor lending practices closely because of the Bank's *de novo* status, rapid loan growth, and the inherent risk associated with CRE and ADC lending.  They also recommended improvements to credit underwriting and credit administration procedures.  The IDFPR further criticized the Bank's failure to document exceptions to its lending policies.

34.     In the February 2008 RoE, the FDIC criticized the Bank's high CRE and ADC concentrations, underwriting and credit administration deficiencies, loan policy violations, and continued excessive growth rate.  The examiners also expressed concern regarding appropriate staffing levels to address loan underwriting and credit administration weaknesses.  In April 2008, the FDIC met with the Board of Directors and senior officers to discuss the concerns raised in this examination.

35.     In the August 2008 visitation, the FDIC again warned the Bank about its excessive growth rate, overconcentration of CRE and ADC loans, and underwriting and credit administration deficiencies.

36.     In the February 2009 RoE, the FDIC and IDFPR again criticized the Bank about its excessive growth, overconcentration of CRE and ADC loans, and poor underwriting and

credit administration.

37.     In December 2009, the Bank entered into a Consent Order with the FDIC and IDFPR, which required the Bank, among other things, to improve its capital ratios, retain qualified management, increase Board participation, restrict total asset growth, reduce all loan concentrations, and revise and improve its lending policies.

38.     In the February 2010 RoE, the FDIC and IDFPR found that the Bank's focus on loan growth over risk diversification and asset quality resulted in large adverse classification levels, substantial charge-offs, and additional provisions to the allowance for loan and lease losses ("ALLL"), which had significantly depleted capital.

39.     In February 2010, the FDIC issued a Prompt Corrective Action letter notifying the Bank that it was critically undercapitalized.  The Bank was required to submit a capital restoration plan by March 15, 2010.  It did not do so and the Bank was closed the following month.

## C.     The Eight Loss Loans

40.     The Bank's loan policies delegated to the Loan Committee the authority to approve loans on the merits.  The approval of a loan required a majority vote of the Loan Committee.  All of the Loan Committee Defendants approved at least one of the Loss Loans.

41.     The following table lists each Loss Loan with its associated loss and identifies which Loan Committee members voted to approve each loan.

| Borrower | Loan Amount | Date of LC Approval | Estimated Loss | Spangler | Sykes | Eichas | Ritter | Sundry | Maly |
|---|---|---|---|---|---|---|---|---|---|
| 2339-59 N. Seeley, LLC | $5.1 million | Apr. 25, 2007 | $3.8 million | X | X | X | X | X | |
| Galewood Plaza II, LLC | $3.62 million | Dec. 12, 2007 | $1.4 million | X | X | X | | X | X |
| Kathryn Gannett | $4.0 million | Dec. 12, 2007 | $3.4 million | X | X | X | | X | X |

| Borrower | Loan Amount | Date of LC Approval | Estimated Loss | Spangler | Sykes | Eichas | Ritter | Sundry | Maly |
|----------|-------------|---------------------|----------------|----------|-------|--------|--------|--------|------|
| Lakemill Plaza, LLC | $10.96 million | Jan. 9, 2008 | $4.4 million | | X | X | | X | |
| Brighton Court, LLC | $7.02 million | Mar. 19, 2008 | $3.2 million | X | X | X | | | X |
| The Macom Corporation/Riverstone Development, LLC | $7.2 million | Jan. 28, 2009 | $1.6 million | X | X | X | | X | X |
| Kyle Properties/CBI Tinley, LLC | $5.6 million | Feb. 25, 2009 | $1.5 million | X | X | X | | X | X |
| Morgan Street Properties, LLC | $4.9 million | Mar. 25, 2009 | $3 million | X | X | X | | X | |

42.     The Loss Loans were made in violation of the general safety and soundness standards of 12 C.F.R. §364.101, Appendix A, the general underwriting standards of 12 C.F.R. §364.101, Appendix A, the real estate lending standards of 12 C.F.R. §365.2, Appendix A, and the Bank's own loan policies and procedures.

43.     The Loan Committee Defendants routinely failed to assess the repayment abilities of borrowers and guarantors, made loans without sufficient financial information or financial analyses, exceeded permitted LTV ratios, violated the Bank's loan policies, made loans without appraisals, funded loans that were not financially feasible, allowed generous interest reserves without consideration of borrower creditworthiness, and failed to oversee loan draws.  The Loan Committee Defendants also approved loans with no or partial guarantees despite the risk this posed to the Bank.  The Loan Committee Defendants also ignored the distressed nature of properties securing the Loss Loans.

44.     Seven of the Loss Loans were made to favored shareholders or borrowers on terms that were preferential and abusive and extremely harmful to the Bank.  These loans were made to 2339-59 N. Seeley, LLC, Galewood Plaza II, LLC, Kathryn Gannett, Lakemill Plaza, LLC, Riverstone Development, LLC, CBI Tinley, LLC, and Morgan Street Properties, LLC

("Insider Loss Loans").

45.     The Insider Loss Loans were made in violation of the Bank's loan policies and structured in a way that exposed the Bank to excessive risk.  The preferential and abusive terms of these loans included, but were not limited to, the following:  (a) approving loans with no guarantees or partial guarantees; (b) approving loans with excessive LTV ratios; (c) approving loans without appraisals; (d) approving loans with deficient collateral; (e) approving loans with inadequate financial information and analyses; (f) funding loans prior to Loan Committee approval; (g) approving loans to borrowers who were not creditworthy and/or experiencing financial difficulty; (h) permitting the inappropriate use of interest reserves; (i) failing to monitor and control disbursements of loan proceeds; and (j) approving loans for projects that were not financially feasible.  When these favored shareholders or borrowers demanded concessions as projects floundered, they received concessions at the further expense of the Bank's interests.

46.     After default, the Bank failed to pursue the favored borrowers or guarantors on the Insider Loss Loans.

47.     In total, the Loss Loans resulted in over $22 million in losses to the Bank.

### 2339-59 N. Seeley, LLC Loan

48.     In April 2007, the Loan Committee approved a $2,969,540 loan to 2339-59 North Seeley, LLC, an entity owned and controlled by William Senne (the "Seeley Loan").

49.     The purpose of the Seeley Loan was the development of a large condominium project.  The loan was a non-recourse, interest-only loan with interest reserves funded by loan proceeds.

50.     Senne owned 40,000 shares of common stock of Wheatland.

51.     The Seeley Loan had numerous deficiencies, including, but not limited to, the

following: (a) Senne provided only a 50 percent guarantee in violation of prudent underwriting standards and the Bank's loan policy commitment to those standards; (b) the loan was made without adequate investigation into the ability of either the borrower or guarantor to repay the loan; (c) the loan was made without a proper appraisal; and (d) $356,000 of the Seeley Loan proceeds were used to acquire the property securing another loan to a Senne controlled entity.

52.     As the loan matured, Defendants continued to place the Bank at risk by extending and increasing the funds made available to the project. On July 11, 2007, the Loan Committee approved a $500,000 to 2339-59 N. Seeley, LLC for soft costs for the development. The loan, itself, however, was made to Senne, individually, not to 2339-59 N. Seeley, LLC and was unsecured (the "Unsecured Loan").

53.     On July 16, 2008, the Loan Committee approved a consolidation of the Seeley Loan and the Unsecured Loan and increased the loan amount to $5,100,000 (the "Consolidated Loan"). No additional security or guarantee was provided. Indeed, the guarantee on the Consolidated Loan was reduced to 33⅓ percent. A September 2008 appraisal valued the property at less than the balance of the Consolidated Loan and, according to federal regulators, evidenced a LTV ratio of 156 percent. By April 2009, Defendant Sykes reported to the Loan Committee that the LTV had grown to 170 percent as the value of the collateral declined.

54.     When interest reserves were depleted, the Consolidated Loan defaulted. Defendants did not pursue Senne as guarantor.

55.     Wheatland lost an estimated $3,825,000 plus accrued interest on this loan.

### Galewood Plaza II, LLC Loan

56.     In December 2007, the Loan Committee approved a $3,025,000 participation loan to Galewood Plaza II, LLC, an entity owned and controlled by Charles Markopolous.

Wheatland's share of the participation was 50 percent or $1,512,500. Shortly thereafter, Defendants Sykes and Eichas unilaterally directed that Wheatland assume 100 percent of the participation obligation and also increased the loan amount to $3,327,500. There were no Loan Committee deliberations prior to the making of the loan as reconfigured. The $3,327,500 commitment was approved *ex post facto* on December 12, 2007.

57.     The loan was made to refinance a failing strip mall and adjacent raw land. The loan was a non-recourse, interest-only loan with payments coming from an interest reserve funded by the loan itself.

58.     Markopolous owned 100,000 shares of common stock of Wheatland.

59.     The loan had numerous deficiencies, including, but not limited to, the following: (a) Markopolous provided only a 25 percent guarantee in violation of prudent underwriting standards and the Bank's loan policy commitment to those standards; (b) the loan was made without adequate investigation into the ability of either the borrower or the guarantor to repay the loan; (c) at the time the loan was made, there were *lis pendens* on the property that impaired the Bank's security interest; (d) the loan funded prior to Loan Committee approval; and (e) the loan was made without obtaining current or complete financial statements or tax returns from either the borrower or the guarantor.

60.     As the loan matured, Defendants exposed the Bank to more risk. In May 2008, Defendants Sykes and Eichas approved a $100,000 increase to fund "soft costs" without additional collateral or security. On December 29, 2008, Defendants Eichas and Sykes approved an additional $200,000 to be used by Markopolous "to reimburse himself for carrying costs." This increase was approved *ex post facto* by the Loan Committee on January 7, 2009, despite delinquent loan payments.

61.     In May 2009, all payments on the loan ceased and the loan defaulted.  The Bank did not pursue Markopolous on his guarantee.

62.     Wheatland lost an estimated $1,373,000 plus accrued interest on this loan.

### Kathryn Gannett Loan

63.     In December 2007, the Loan Committee approved a $1,695,000 line of credit to Gannett Family LLC with Kathryn Gannett providing a 50 percent guarantee.  Subsequent loan documents reversed these relationships for reasons that do not appear in the Loan Committee minutes:  Gannett became the obligator on the loan and Gannett Family LLC became the 50 percent guarantor.

64.     The purpose of the loan was to provide capital funds for the Gannett's real estate investments.  The loan was secured by a second lien on residential property in Vail, Colorado.  The first lien resulted from a $4,000,000 Wheatland mortgage loan that was approved at the same time as the line of credit.  The mortgage loan was subsequently purchased by Wells Fargo Bank, which then assumed a first lien position.  In short, the property securing these loans was highly leveraged making the need for a proper appraisal and full guarantee even more important.

65.     The Gannett Family, LLC and members of the Gannett family owned 127,000 shares of common stock of Wheatland.  The Gannetts were close friends and business associates of Defendants Sykes and Sundry.

66.     The loan had numerous deficiencies, including but not limited to, the following: (a) the Gannett Family, LLC provided only a 50 percent guarantee in violation of prudent underwriting standards and the Bank's loan policy commitment to those standards; (b) the loan was made without an adequate investigation into the ability of either the borrower or guarantor to repay the loan; and (c) no due diligence was performed to determine the impact of the declining

real estate market on the property that secured the loan.

67.     In the February 2008 RoE, federal and state regulators warned Defendants of the specific underwriting deficiencies in the Gannett loan, including, but not limited to, the failure to ascertain whether the borrower or guarantor had the ability to repay the loan obligations.

68.     Defendants ignored this warning and, instead, increased the Bank's exposure.  In July 2008, the Loan Committee approved a modification of the loan from a revolving line of credit to a non-revolving construction line of credit and increased it to $4,000,000.  The purpose of this modification was to provide funds for the renovation of the Gannetts' vacation home in Vail, Colorado.  The appraisal supporting this increase was ordered by Gannett's husband and not the Bank, which violated the Bank's loan policy.

69.     At the time of the increase, the Gannett Family LLC executed a guarantee for 100 percent of the loan, signed by Gannett.  Stephen Sabor, a Wheatland vice president, subsequently determined that Gannett did not have authority under the Gannett Family, LLC Operating Agreement to execute the guarantee on behalf of the Gannett Family, LLC.  On information and belief, no proper guarantee was ever provided by the Gannett Family, LLC.

70.     In the December 2008 RoE, examiners noted that Defendants still had not completed appropriate due diligence into the ability of the borrower or guarantor to repay the Gannett loan.

71.     Defendants also failed to monitor and control the loan.  Defendants permitted Gannett to draw on the construction line of credit for improper purposes, including, but not limited to, the following: (a) payment of real estate taxes; (b) payment of utilities; and (c) purchase of interior fixtures and furniture.  Ultimately, Gannett was allowed to withdraw in excess of $732,989 from the line of credit for questionable expenses.

72.     In July 2009, Gannett ceased making payments on the loan. Nevertheless, on July 21, 2009, the Bank funded approximately $80,000 for the continued renovation of the Gannetts' home. Moreover, Defendants left the line of credit open until December 18, 2009. Significant funds continued to be drawn on the line of credit between August 2009 and December 2009.

73.     The Bank sent demand letters in August 2009, but made no other attempts to collect the unpaid balance. The Bank made no attempt to pursue the Gannett Family LLC on its purported guarantee.

74.     Wheatland lost an estimated $3,367,000 plus accrued interest on this loan.

75.     The Loan Committee approved numerous other loans to Gannett entities causing a troubling concentration of credit. The Gannetts, individually or through companies they owned or controlled, had Wheatland loans totaling in excess of $27 million as of the end of 2009. The lending to the Gannetts in such concentrations was done without consideration of the risk it posed to the Bank.

**Lakemill Plaza, LLC Loan**

76.     In January 2008, the Loan Committee approved a $10,960,000 loan to Lakemill Plaza, LLC, an entity owned and controlled by Charles Markopolous. The loan was secured by a troubled retail strip mall that was less than 30 percent occupied.

77.     The purpose of the loan was to acquire and renovate the failing strip mall, which had been built in 1965. The loan was a non-recourse, interest-only loan with payments coming from an interest reserve funded by the loan itself.

78.     Markopolous owned or controlled 100,000 shares of common stock of Wheatland.

79.     A November 2007 appraisal indicated an "as is" value significantly less than the amount of the loan and a LTV ratio of 140 percent.   The Loan Committee approval memorandum also indicated that the loan exceeded the Bank's in-house lending limits for Markopolous.

80.     The loan had numerous deficiencies, including, but not limited to, the following: (a) Markopoulos provided only a 25 percent guarantee in violation of prudent underwriting standards and the Bank's loan policy commitment to those standards; (b) the loan was made without an adequate investigation into the ability of either the borrower or guarantor to repay the loan; (c) the property securing the loan was in severe distress; and (d) the LTV ratio of 140 percent was in violation of the Bank's loan policy and regulatory guidelines.

81.     When the interest reserve was depleted, no further payments were made by the borrower or the guarantor.   In May 2009, the loan defaulted.   The Bank did not pursue Markopolous on his guarantee.

82.     Wheatland lost an estimated $4,400,000 plus accrued interest on this loan.

83.     The Loan Committee approved numerous other loans to Markopolous entities causing a troublesome concentration of credit.   Markopolous or entities he owned or controlled had Wheatland loans totaling in excess of $23 million at the end of 2009.   The lending to Markopolous in such concentrations was done without consideration of the risk it posed to the Bank.

### Brighton Court, LLC Loan

84.     In March 2008, the Loan Committee approved a $5,600,000 loan to Brighton Court, LLC for the purpose of constructing an office building.   George Venturella owned and controlled Brighton Court, LLC.

85.     The loan was a non-recourse, interest-only loan with interest payments made from reserves funded by the loan itself.  Venturella guaranteed 50 percent of the loan.

86.     On the day the loan was approved, Defendant Sykes realized that the value of the property would not support the loan.  He authored an internal memorandum "to file" stating that the loan should be reduced to $4,200,000 to conform to regulatory guidelines.  Nonetheless, the closing statement reflects a loan of $5,600,000.

87.     The loan had numerous deficiencies, including, but not limited to, the following: (a) Venturella provided only a 50 percent guarantee in violation of prudent underwriting standards and the Bank's loan policy commitment to those standards; (b) the loan was made without investigation into the ability of the borrower to repay the loan; (c) no written appraisal was obtained prior to the approval or funding of the loan; (d) a post-closing appraisal indicated a LTV ratio of 106 percent in violation of the Bank's loan policy and regulatory guidelines; (e) the loan was permitted to close without title insurance; and (f) the Bank's mortgage interest was not timely recorded.

88.     Contrary to prudent loan administration practices, $400,000 of the Brighton Court loan was used to fund interest reserves on another Venturella loan at Wheatland, the troubled Village Walk loan.  Venturella also guaranteed the Village Walk loan and would be liable for $2,700,000 if that loan defaulted.  One year later, on March 26, 2009, Defendant Sykes authorized a second transfer of $240,000 from the Brighton Court loan to the Village Walk loan interest reserve.

89.     As the loan matured, Defendants exposed the Bank to additional risk.  In May 2009, the Loan Committee approved a $784,000 increase to the Brighton Court loan.  The documents submitted in support of the increase indicated that Venturella's credit had

significantly deteriorated over the prior year and the property remained severely distressed. No new collateral was obtained to secure the Bank's increased exposure. No new guarantees were obtained.

90.     In July 2009, the Loan Committee approved yet another increase of $644,948.16 to the Brighton Court loan. Significant sums of money had been spent by the borrower and Venturella without completing the project even though, at the inception of the loan, the building was already 50 percent completed. No additional collateral and no new guarantees were obtained to secure this increase.

91.     By the end of September 2009, the amount remaining in the interest reserve was insufficient to pay the October 2009 payment. Once the interest reserve was depleted, neither the borrower nor the guarantor made any further payments. The Bank made no effort to pursue Venturella on his guarantee.

92.     Wheatland lost an estimated $3,160,229 plus accrued interest on this loan.

93.     The Loan Committee approved numerous other loans to Venturella entities causing a troublesome concentration of credit. Venturella and entities he owned or controlled had Wheatland loans in excess of $25 million at the end of 2009. The lending to Venturella in such concentrations was done without consideration of the risk it posed to the Bank.

**The Macom Corporation/Riverstone Development, LLC Loan**

94.     In April 2008, the Loan Committee approved a $7,215,500 loan to Macom Corporation secured by raw land in Plainfield and Oswego, Illinois (the "Macom Loan"). The purpose of this loan was to refinance land acquisition debt for speculative development. The loan was guaranteed by the president of Macom Corporation.

95.     The Macom Loan had numerous deficiencies including, but not limited to, the

following: (a) the loan was made without adequate investigation into the ability of the borrower or guarantor to repay the loan; (b) the loan was made without a proper appraisal; (c) the Macom Corporation was in significant financial distress at the time of the making of the loan; and (d) the loan funded prior to Loan Committee approval.

96. The Macom Loan defaulted less than a year after its origination. The Bank made no effort to pursue the guarantee.

97. In January 2009, the Loan Committee approved a $7,215,500 loan to Riverstone Development, LLC to take over the troubled Macom Loan (the "Riverstone Loan"). The principals of Riverstone Development were Mark Ruane ("Ruane") and Frank Laskaris ("Laskaris"). The purpose of this loan was to avoid loss recognition. The risk associated with the continued backing of a failed development was ignored by the Loan Committee.

98. Ruane Construction owned approximately 160,000 shares of common stock of the Bank. Laskaris owned 200,000 shares of common stock of the Bank. In August 2009, Laskaris became a member of the Board of Directors of Wheatland.

99. The Riverstone Loan had numerous deficiencies including, but not limited to, the following: (a) the Bank did not require personal guarantees in violation of the Bank's loan policy, which required a 100 percent guarantee and that the guarantees be joint and several; (b) the loan was made without an adequate investigation into the ability of the borrower to repay the loan; (c) the LTV ratio of 83.7 percent was in violation of the Bank's loan policy and regulatory guidelines; and (d) the loan funded prior to Loan Committee approval.

100. The loan was approved by the Loan Committee despite strong FDIC and IDFPR criticism of the Bank's lending and underwriting practices just weeks earlier.

101. Wheatland lost an estimated $1,615,000 plus accrued interest on this loan.

**Kyle Properties/CBI Tinley, LLC Loan**

102.    In January 2008, the Loan Committee approved a grossly improvident loan to Kyle Properties to develop a troubled strip mall.  The underwriting was very poor and the guarantees were insufficient.  Less than a year later, the loan was in default.

103.    In February 2009, the Loan Committee approved a $5,636,733 loan to CBI Tinley, LLC to purchase the Kyle Properties' note.  As with the Riverstone Development loan, the purpose of this loan was to avoid loss recognition.  The principals of CBI Tinley, LLC were Mark Carlson and Robb Carlson, close business associates of Ruane Construction and other major shareholders of Wheatland.  Each provided a 50 percent guarantee.

104.    The CBI Tinley loan had numerous deficiencies including, but not limited to, the following:  (a) each guarantor only provided a partial guarantee in violation of the Bank's policy, which required a 100 percent guarantee and that the guarantees be joint and several; (b) no financial statements or tax returns were obtained from the borrower; (c) the loan was made without a proper appraisal; (d) post-closing appraisals indicated a LTV ratio of 87 percent in violation of the Bank's loan policy and regulatory guidelines; (e) the loan was made without realistic plans or strategies for returning the distressed property to health; and (f) the loan funded prior to Loan Committee approval.

105.    Within three months of origination, loan payments stopped.  The Bank's September 2009 Watch List noted:  "The Carlsons are no longer interested in the property and are expected to 'give back' the note, leaving the Bank with the under-performing strip center." The Bank did not pursue the Carlsons on their guarantees.

106.    Wheatland lost an estimated $1,482,000 plus accrued interest on this loan.

## Morgan Street Properties, LLC Loan

107.    In March 2009, the Loan Committee approved a $4,921,500 loan to Morgan Street Properties, LLC, an entity owned and controlled by Thomas Ruane, Robb Carlson and Mark Carlson.  The purpose of the loan was to refinance three prior Wheatland notes that were in default and to provide new funds of approximately $300,000 to the borrower.  Mr. Ruane provided a 50 percent guarantee.  Each of the Carlson brothers provided as 25 percent guarantee.

108.    The prior defaulted loans were poorly underwritten and the properties securing the loans were in serious distress with building code violations and anticipated code enforcement proceedings by the City of Chicago.  As with the CBI Tinley loan, the Morgan Street Properties loan was made despite strong prior FDIC and IDFPR criticism in December 2008 of the Bank's underwriting practices.

109.    The loan had numerous deficiencies, including, but not limited to, the following: (a) each of the guarantors only provided a partial guarantee in violation of the Bank's policy, which required a 100 percent guarantee and that the guarantees be joint and several; (b) the loan was made without adequate investigation into the ability of the borrower to repay the loan; (c) the loan was made without proper appraisals; and (d) subsequent appraisals indicated that the LTV ratio of 128 percent was in violation of the Bank's loan policy and regulatory guidelines.

110.    Less than six months after origination, the loan was in default.  A November 2009 appraisal indicated that the value of the property was $2,100,000 – well below the outstanding balance of the loan.  Following the default, Defendants made no attempts to pursue Thomas Ruane or the Carlsons on their guarantees.

111.    Wheatland lost an estimated $2,989,500 plus accrued interest on this loan.

D.      **The Director Defendants' Failure to Properly Supervise the Operations of the Bank**

112.    The Director Defendants failed to properly oversee and supervise the affairs of the Bank. They allowed the Bank to be operated in an unsafe and unsound manner. The Director Defendants permitted management to violate the Bank's business plan and loan policies as well as ignore applicable laws and regulations. The Director Defendants also failed to select and retain competent management.

113.    The Director Defendants failed to properly supervise and oversee the Bank's lending operations. The Loss Loans were poorly underwritten and made in violation of the Bank's loan policies. The Director Defendants permitted loans to be made to favored shareholders and borrowers on terms that were preferential, abusive and harmful to the financial interests of the Bank. And they permitted the Bank to embark on an overly aggressive and risky lending strategy, which produced dangerous concentrations of CRE and ADC loans.

114.    The Director Defendants failed to exercise independent judgment in evaluating the actions and competency of management. Despite being provided with detailed information on the operations of the Bank, including monthly reports of loans approved by the Loan Committee, loan concentrations, liquidity analyses, ALLL data, and regulatory reports and correspondence, the Director Defendants failed to take any meaningful actions to protect the Bank.

115.    The failure to supervise was particularly egregious given strong and repeated regulatory warnings. By October 1, 2007, the Director Defendants were warned about the Bank's excessive growth rate, high concentration of risky CRE and ADC loans, violations of LTV ratio guidelines, and poor earnings. In particular, the Director Defendants were urged to closely monitor loan concentrations because of the Bank's *de novo* status, rapid loan growth, and

inherent risk associated with CRE and ADC lending. The regulators also had recommended improvements to credit underwriting and credit administration and criticized the Bank's failure to document exceptions to its lending policies. In every subsequent regulatory examination, the Director Defendants were warned about these and other weaknesses. The Director Defendants ignored these warnings and took no remedial action to protect the Bank. Instead, they permitted poorly underwritten CRE and ADC lending to continue over the next two years.

## V. CLAIMS FOR RELIEF

### COUNT I
### GROSS NEGLIGENCE CLAIMS AGAINST
### SPANGLER, SUNDRY, SYKES, EICHAS, MALY AND RITTER
### FOR APPROVING THE LOSS LOANS

116. The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

117. Defendants Spangler, Sundry, Sykes, Eichas, Maly, and Ritter were members of the Loan Committee, and directors and/or officers of the Bank.

118. Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

119. As directors and/or officers, the Loan Committee Defendants owed Wheatland a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, the following: (a) informing themselves about proposed loans and the risks the loans posed to the Bank before approving them; (b) approving only those loans that conformed with the Bank's loan policies; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e)

ensuring that loans were not made to favored shareholders or borrowers on terms that were preferential and abusive and harmful to the Bank; (f) ensuring that any loans they approved did not violate applicable banking laws and regulations; and (g) ensuring that any loans they approved did not create unsafe and unsound concentrations of credit.

120.    The Loan Committee Defendants breached their duties and were grossly negligent by, among other things:  (a) failing to inform themselves about the Loss Loans and the risks the loans posed to the Bank before approving them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) approving Loss Loans to favored shareholders or borrowers on terms that were preferential, abusive and harmful to the Bank; (f) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (g) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (h) ignoring regulatory warnings about the Bank's lending operations.

121.    As a direct and proximate cause of the gross negligence of the Loan Committee Defendants, the FDIC suffered damages in excess of $22 million.

### COUNT II
### NEGLIGENCE CLAIMS AGAINST
### SPANGLER, SUNDRY, SYKES, EICHAS, MALY AND RITTER
### FOR APPROVING THE LOSS LOANS

122.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

123.    Defendants Spangler, Sundry, Sykes, Eichas, Maly, and Ritter were members of the Loan Committee, and directors and/or officers of the Bank.

124.    The Loan Committee Defendants owed Wheatland a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, the following: (a) informing themselves about proposed loans and the risks the loans posed to the Bank before approving them; (b) approving only those loans that conformed with the Bank's loan policies; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) ensuring that loans were not made to favored shareholders or borrowers on terms that were preferential and abusive and harmful to the Bank; (f) ensuring that any loans they approved did not violate applicable banking laws and regulations; and (g) ensuring that any loans they approved did not create unsafe and unsound concentrations of credit.

125.    The Loan Committee Defendants breached their duties and were negligent by, among other things:  (a) failing to inform themselves about the Loss Loans and the risks the loans posed to the Bank before approving them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) approving Loss Loans to favored shareholders or borrowers on terms that were preferential and abusive and harmful to the Bank; (f) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (g) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (h) ignoring regulatory warnings about the Bank's lending operations.

126.    As a direct and proximate cause of the negligence of the Loan Committee

Defendants, the FDIC suffered damages in excess of $22 million.

## COUNT III
### BREACH OF THE FIDUCIARY DUTY OF CARE CLAIMS AGAINST SPANGLER, SUNDRY, SYKES, EICHAS, MALY AND RITTER FOR APPROVING THE LOSS LOANS

127.  The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

128.  Defendants Spangler, Sundry, Sykes, Eichas, Maly, and Ritter were members of the Loan Committee, and directors and/or officers of the Bank.

129.  The Loan Committee Defendants owed Wheatland fiduciary duties to exercise the utmost care, skill and diligence in the performance of their responsibilities, including, but not limited to, the following:  (a) informing themselves about the Loss Loans and the risks the loans posed to the Bank before approving them; (b) approving only those loans that conformed with the Bank's loan policies; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) ensuring that loans were not made to favored shareholders or borrowers on terms that were preferential and abusive and harmful to the Bank; (f) ensuring that any loans they approved did not violate applicable banking laws and regulations; and (g) ensuring that any loans they approved did not create unsafe and unsound concentrations of credit.

130.  The Loan Committee Defendants breached their fiduciary duties by, among other things:  (a) failing to inform themselves about proposed loans and the risks the loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral

and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) approving Loss Loans to favored shareholders or borrowers on terms that were preferential and abusive and harmful to the Bank; (f) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (g) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (h) ignoring regulatory warnings about the Bank's lending operations.

131.    As a direct and proximate cause of the breach of the fiduciary duty of care by the Loan Committee Defendants, the FDIC suffered damages in excess of $22 million.

### COUNT IV
### BREACH OF THE DUTY OF LOYALTY CLAIMS AGAINST
### SPANGLER, SUNDRY, SYKES, EICHAS, MALY AND RITTER
### FOR APPROVING THE INSIDER LOSS LOANS

132.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

133.    Defendants Spangler, Sundry, Sykes, Eichas, Maly, and Ritter were members of the Loan Committee, and directors and/or officers of the Bank.

134.    The Loan Committee Defendants owed Wheatland a fiduciary duty of loyalty. The Loan Committee Defendants had a duty to act with the utmost good faith and in the best interests of the Bank.

135.    With respect to the Insider Loss Loans, the Loan Committee Defendants breached their duty of loyalty by approving loans to favored shareholders and borrowers on terms that were preferential, abusive and against the best interests of the Bank. The Loan Committee Defendants further breached their duty of loyalty by failing to pursue borrowers and/or guarantors on loans made to favored shareholders and borrowers after those loans defaulted.

136.    As a direct and proximate cause of the breach of the duty of loyalty by the Loan

Committee Defendants, the FDIC suffered damages in excess of $19 million.

## COUNT V
## GROSS NEGLIGENCE CLAIMS
## AGAINST SPANGLER, SYKES, SUNDRY, MALY, REES,
## DAVOLT, BELES, AND HARVEY FOR FAILURE TO SUPERVISE

137.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

138.    Defendants Spangler, Sykes, Sundry, Maly, Rees, Davolt, Beles, and Harvey were directors of the Bank.

139.    The Director Defendants had a duty properly to supervise, manage and oversee the lending operations and business affairs of the Bank.

140.    The Director Defendants were grossly negligent in failing properly to supervise, oversee and manage the Bank's lending operations by, among other things:  (a) permitting the Bank to pursue an overly aggressive and risky loan growth strategy; (b) permitting violations of the Bank's business plan; (c) permitting poorly underwritten loans to be made; (d) permitting loans to be made in violation of the Bank's loan policies; (e) permitting loans to be made in violation of prudent credit underwriting practices; (f) permitting overconcentration of CRE and ADC loans; (g) failing to supervise adequately the Loan Committee; (h) permitting loans to be made to favored shareholders and borrowers on preferential and abusive terms; (i) failing to exercise independent judgment in evaluating the actions of management; (j) ignoring regulatory warnings about the Bank's lending operations; and (k) failing to take necessary actions to protect the Bank.

141.    As a direct and proximate cause of the grossly negligent failure to supervise by the Director Defendants, the FDIC suffered damages in excess of $22 million.

## COUNT VI
## NEGLIGENCE CLAIMS AGAINST
## SPANGLER, SYKES, SUNDRY, MALY, REES,
## DAVOLT, BELES, AND HARVEY FOR FAILURE TO SUPERVISE

142.     The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

143.     Defendants Spangler, Sykes, Sundry, Maly, Rees, Davolt, Beles, and Harvey were directors of the Bank.

144.     The Director Defendants had a duty properly to supervise, manage and oversee the lending function and business affairs of the Bank.

145.     The Director Defendants were negligent in failing properly to supervise, oversee and manage the Bank's lending operations by, among other things:  (a) permitting the Bank to pursue an overly aggressive and risky loan growth strategy; (b) permitting violations of the Bank's business plan; (c) permitting poorly underwritten loans to be made; (d) permitting loans to be made in violation of the Bank's loan policies; (e) permitting loans to be made in violation of prudent credit underwriting practices; (f) permitting overconcentration of CRE and ADC loans; (g) failing to supervise adequately the Loan Committee; (h) permitting loans to be made to favored shareholders and borrowers on preferential and abusive terms; (i) failing to exercise independent judgment in evaluating the actions of management; (j) ignoring regulatory warnings about the Bank's lending operations; and (k) failing to take necessary actions to protect the Bank.

146.     As a direct and proximate cause of the negligent failure to supervise by the Director Defendants, the FDIC suffered damages in excess of $22 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the FDIC as Receiver for Wheatland Bank, asks this Court to grant the following relief:

A.   As to Count I, II, and III entry of judgment in favor of FDIC and against Defendants for damages in an amount in excess of $22 million plus accrued interest;

B.   As to Count IV entry of judgment in favor of FDIC and against Defendants for damages in an amount in excess of $19 million plus accrued interest;

C.   As to Count V and VI entry of judgment in favor of FDIC and against Defendants for damages in an amount in excess of $22 million plus accrued interest;

D.   For its costs of suit against Defendants;

E.   For prejudgment interest;

F.   For attorneys' fees and costs, costs for the investigation and litigation, and interest; and

G.   For such further and other relief as this Court deems proper.

## **JURY DEMAND**

THE FDIC REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE OF RIGHT BY JURY

Dated: May 5, 2011                    Respectfully submitted,

/s/ F. Thomas Hecht
One of the Attorneys for the Federal Deposit
Insurance Corporation as Receiver for Wheatland
Bank

F. Thomas Hecht
Tina B. Solis
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
(312) 977-4405 (facsimile)


Gregory K. Conway
Counsel, Professional Liability Unit
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226