**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION AS RECEIVER FOR | ) | |
| WHEATLAND BANK, | ) | |
| | ) | Case No. 10 CV 4288 |
| Plaintiff, | ) | Consolidated with |
| | ) | Case No. 10 CV 4687 |
| v. | ) | |
| | ) | Hon. William T. Hart |
| LEWIS MARK SPANGLER, ARTHUR P. | ) | |
| SUNDRY, JR., MICHAEL A. SYKES, | ) | JURY TRIAL REQUESTED |
| LEONARD EICHAS, FRANK MALY, | ) | |
| DOLORES RITTER, MARY DAVOLT, | ) | |
| BEVERLY HARVEY, MICHAEL REES, | ) | |
| and NORMAN BELES | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT, MARY DAVOLT'S MEMORANDUM IN SUPPORT OF
HER MOTION TO DISMISS COUNTS V AND VI
OF THE FIRST AMENDED COMPLAINT**

Defendant, Mary Davolt, by and through her attorneys, Kelly McCloskey Cherf, Patrick E. Deady and Evan J. Haim of Hogan Marren, Ltd., in support of her motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Counts V (Gross Negligence) and VI (Negligence) of the Federal Deposit Insurance Corporation's ("FDIC") First Amended Complaint, submits the following Memorandum of Law.

**INTRODUCTION**

Mary Davolt owned 8,400 shares of common stock of Wheatland Bank (the "Bank") and served as a member of the Bank's Board of Directors from March, 2007 until she resigned in September, 2009. First Amended Complaint ("FAC") (Dkt. No. 29), ¶14. Davolt was not an officer or employee of the Bank and did not serve on the Loan Committee of the Board or on any other Board committee with oversight or auditing responsibilities. FAC, ¶18. She is referred to

in the First Amended Complaint as one of the "Outside Director Defendants." FAC, ¶17. Davolt was not named as a defendant in either of the two state court lawsuits filed, one by the Bank and one as a derivative shareholder action, against some of the officers and directors prior to April 23, 2010, when the Illinois Department of Financial and Professional Regulation ("IDFPR") took possession and control of the Bank. After the IDFPR requested that the FDIC accept appointment as receiver for the Bank, those two state court actions were removed to the Northern District of Illinois on July 4, 2010 and July 27, 2010, and later consolidated before this Court. On May 5, 2011, after having possession and control of the documents and records of the Bank for more than a year, the FDIC filed its First Amended Complaint, adding Davolt and several other directors to the instant case. Davolt is named in Count V (Gross Negligence) and Count VI (Negligence) for failure to supervise the lending activities of the Bank. Davolt is not named in any of the other Counts of the FAC.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. __, 129 S.Ct. 1937 (2009). "[T]hat the allegations undergirding a claim could be true is no longer enough to save a complaint from being dismissed" because "what is plausible has a moderately higher likelihood of occurring." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). This standard varies from case to case, but it is particularly high in suits like this one, which are very complex and which will trigger broad and costly discovery if the complaint survives a motion to dismiss. *3525 North Reta, Inc. v. FDIC*, 2011 WL 62128 at *3 (N.D. Ill. 2011).

2

Rule 8 requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In order to survive a motion to dismiss under Rule 12(b)(6) and satisfy the requirements of Rule 8, a plaintiff must file a complaint with sufficient detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic*, 550 U.S. at 555. That is to say that the allegations in a complaint "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). Conclusory statements and abstract recitations of the elements of a cause of action are not allowed. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

The FDIC's generalized allegations of Defendant Davolt's supposed failure to properly supervise, oversee and manage the Bank's lending operation do not come close to satisfying these heightened pleading standards. Both Counts V and VI fail to state a claim as a matter of law and must be dismissed pursuant to Rule 12(b)(6).

## ARGUMENT

## I.  COUNT V DOES NOT STATE A CLAIM FOR GROSS NEGLIGENCE.

The FDIC characterizes Count V as its gross negligence claims against the eight directors for failure to supervise.  In order to state a colorable claim for gross negligence against Davolt, the FDIC must allege adequate facts to inform Davolt which of her actions or inactions were grossly negligent.  Courts in the Northern District constructing Illinois law in this context have accepted the following definition for gross negligence: "Gross negligence is commonly understood to encompass "very great negligence…but it is something less than the willful, wanton and reckless conduct."  *Federal Deposit Ins. Corp. v. Gravee*, 966 F. Supp. 622, 636

(N.D. Ill. 1997) citing *Massa v. Department of Registration and Education*, 507 N.E. 2d 814, 819 (Ill. 1987). No allegations in the FAC provide a basis for a claim of gross negligence against Davolt. Further, even if the necessary allegations could be read into the pleading, the FDIC failed to allege facts necessary to overcome the presumptions in favor of Davolt as recognized under the Business Judgment Rule.

   **A.     The First Amended Complaint Is Devoid Of Allegations Rising To Gross Negligence.**

As alleged in the FAC, Davolt was an "Outside Director." FAC, ¶17. As an Outside Director, Davolt's duties and responsibilities differ from the other directors who may also have been officers or employees of the Bank. That the FDIC distinguished in the FAC between the "Outside Director Defendants" and the other "Director Defendants" is a tacit admission that there are differences in the responsibilities and duties of the Outside Directors, compared to directors who are also Bank officers. Davolt did not serve as a member of the Loan Committee. FAC, ¶18. Nor does the FAC allege that Davolt served on any other Board committee that would impose a similar heightened duty of care. The FDIC fails to make any other allegations regarding the duties or responsibilities of Davolt as an Outside Director. Of the approximately 130 remaining paragraphs in the FAC, the FDIC does not allege any facts specific to Davolt, or to the Outside Directors as a group.

General allegations as to all the individual defendants are insufficient to establish liability. *Johnson v. Tellabs, Inc.*, 262 F.Supp.2d 937, 959 (N.D. Ill. 2003). "The mere fact that Plaintiff alleges these defendants are directors is not enough." *Donovan v. ABC-NACO Inc.*, No. 02 C 1951, 2002 WL 1553259, *6 (N.D. Ill. July 15, 2002) (finding a lack of specific allegations against individual director defendants fatal to a complaint alleging liability under Section 10(b) of the Securities Exchange Act of 1934).

The FDIC concedes Davolt was not a member of the Loan Committee (FAC, ¶18) and recognizes that the Loan Committee was authorized to consider loan applications and approve or deny loans without the approval by Davolt or other directors. FAC, ¶40. Nothing in the FAC alleges specifically that Davolt knew or should have known some fact during the course of performing her duties as an Outside Director that should have caused her to question any of the specific loans described in the Complaint or any of the activities of the Loan Committee. That the FDIC could allege no such facts demonstrates that Count V fails to allege "very great negligence," as required under Illinois law.

There also are no facts alleged that indicate Davolt herself knew or should have known that the Loan Committee was not discharging its own, separate duties, as required by the Bank's stated policies. "The allegation that the Outside Directors, qua directors and members of the audit committee, had access to unspecified business records and a duty to review them does not give rise to a strong inference that the Outside Directors individually knew of or recklessly disregarded particular wrongful recognitions of revenue." *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 281-282 (3rd Cir. 2006) (dismissing complaint alleging 10(b) claims against outside directors). Here, the inference is even more tenuous since the FAC is devoid of any factual allegations directed at some documents Davolt received or had access to that should have caused her to believe that the Loan Committee was not following the appropriate procedures. In failing to clearly state what Davolt knew or should have known as an Outside Director and what actions she took or failed to take after receiving some specific information, the FDIC has failed to properly state a claim for gross negligence as to Davolt.

**B.     The FDIC Failed To Allege Facts To Overcome The Business Judgment Rule.**

As a director of a bank in Illinois, Davolt is afforded the protection of the Business Judgment Rule while serving as an Outside Director for the Bank.   "Under [the business judgment rule], the judgment of directors of corporations enjoys the benefit of a presumption that it was formed in good faith and was designed to promote the best interests of the corporation they serve.   Consequently, absent allegations of bad faith, fraud, illegality or gross overreaching, courts are not at liberty to interfere with the exercise of business judgment by corporate directors."   *Stamp v. Touche Ross and Company*, 63 N.E. 2d 616, 621 (Ill. App. Ct. 1993).

When evaluating a director's exercise of due care, it is the decision-making process, not the decision itself that is considered.   *In re Caremark Intern. Inc. Derivative Litigation*, 698 A.2d 959, 967-968 (Del. Ch Ct. 1996) (finding the decision of the directors, even if wrong, does not provide grounds for liability, so long as the process employed in reaching the decision was rational or employed in good faith).   To rebut the business judgment rule, the FDIC must set forth allegations that Davolt, in executing her duties as an Outside Director, somehow acted without good faith, fraudulently, or illegally.   The FDIC has failed to make any allegations of any such conduct by Davolt.

The only allegation involving Davolt's performance of her duties was that she "regularly attended meetings of the Loan Committee as a non-voting observer."   FAC, ¶14.   The FDIC does not allege that Davolt should not have relied upon the information presented at any of the Loan Committee meetings she attended or that she should have taken some Board action to limit or override a decision of the Loan Committee based on some specific information she acquired while an Outside Director.   Furthermore, the FDIC fails to allege any facts that might demonstrate why Davolt should not have relied on information she may have received and

reviewed from the Loan Committee as part of her duties as a director. The FDIC similarly fails to allege that Davolt acted irrationally or in bad faith in any way. Most notably, the FDIC fails to allege whether any of the eight challenged loans were discussed at the Loan Committee meetings Davolt attended or that any of these loans were discussed at any Board meeting Davolt attended.

In fact, the FDIC makes no allegations, specific or general, concerning any of the meetings of the Loan Committee or the Board attended by Davolt, nor does the FAC suggest that Davolt was not satisfying her duty to the Board as a director. "In the absence of factual allegations to the contrary in the complaint, [the court] must presume that the defendants acted in good faith and with due care, and as a result the business judgment rule precludes their liability." *Stamp v. Touche Ross and Company*, 63 N.E.2d 616, 622 (Ill. App. Ct. 1993). In failing to state allegations which would rebut the presumptions afforded under the Business Judgment Rule, the FDIC has failed to state a valid claim of gross negligence against Davolt.

### C. Davolt Was Entitled To Rely On Consultants And/Or The Loan Committee In Executing Her Duties.

The FDIC's failure to allege facts necessary to overcome the Business Judgment Rule is compounded by the fact that the Illinois Banking Act allows Davolt to rely on certain internal and external bank sources as a Director.

The Loan Committee was established by and operated within the bank's loan policies. FAC, ¶40. The FDIC alleges that the Loan Committee was vested with the authority to approve or deny loans without further consideration by the board of directors. *Id*. According to the FAC, the Loan Committee operated separately and apart from the Board of Directors as a whole. In fact, according to the FDIC, the only communications from the Loan Committee to Davolt would have been monthly reports detailing only those loans that had been approved. FAC, ¶114.

7

The Illinois Banking Act provides guidelines for directors in the execution of their duties. Section 5/16(7) states specific examples of the types of information and sources that directors can rely upon.

> (b)    In discharging the duties of their respective positions, the board of directors, committees of the board, and individual directors shall be entitled to rely on advice, information, opinions, reports or statements, including financial statements and financial data, prepared or presented by: (i) one or more officers or employees of the bank whom the director believes to be reliable and competent in the matter presented; (ii) one or more counsels, accountants, or other consultants as to matters that the director believes to be within that person's professional or expert competence; or (iii) a committee of the board upon which the director does not serve, as to matters within that committee's designated authority; provided that the director's reliance under this paragraph (b) is placed in good faith, after reasonable inquiry if the need for such inquiry is apparent under the circumstances and without knowledge that would cause such reliance to be unreasonable.

205 ILCS 5/16(7)(b) (West 2011).  The FDIC makes no allegations that would even suggest Davolt, in any way, failed to execute her duties as permitted by §5/16(7)(b).

There are no allegations that suggest Davolt knew any of the reports from the Loan Committee were fraudulent or incorrect or in any way should not have been relied on by her. The FDIC does not allege at which Loan Committee meetings each of the challenged loans were discussed, or even whether Davolt was present at these Loan Committee meetings.  More importantly, the FDIC fails to allege whether any of the alleged problem loans were ever discussed or considered at a meeting of the Board of Directors.  The FDIC does not allege what other information Davolt received that should have caused her question or disregard the monthly reports of the Loan Committee.  In the absence of any allegation that Davolt had reason not to rely on the decisions of the Loan Committee, the FDIC fails to establish that Davolt could or should not have reasonably relied on the Loan Committee, a committee upon which she did not serve.  *See* FAC, ¶18.

The FDIC alleges only, "The Director Defendants failed to exercise independent judgment in evaluating the actions and competency of management." FAC, ¶114. However, this conclusory statement is made without alleging any facts that would even suggest why Davolt, or any of the other directors, should not have relied on the "advice, information, opinions … prepared or presented by: (i) one or more officers or employees of the bank…; (ii) one or more counsels, accountants, or other consultants…; or (iii) a committee of the board," as prescribed by §5/16(7)(b) of the Illinois Banking Act. The FDIC's sole reason that Davolt should not have relied on the reports and opinions of the Bank's officers or the Loan Committee is that certain loans wound up in default. There are no allegations Davolt or the other directors knew information provided to them was unreliable or that some of the officers were engaged in fraud or some other illegality or even some irregularity which Davolt knew or should have known at the time the loans were approved and funded by the Bank. Accordingly, the FDIC has failed to provide a plausible basis for this Court to find that Davolt could be liable for gross negligence in the execution of her duties as an Outside Director.

### D. Davolt Did Not Fail To Heed Any Regulatory Warnings.

In Paragraphs 32 through 39 of the FAC, the FDIC alleges regulators "repeatedly warned Defendants." FAC, ¶32. The FDIC alleges that regulators were in contact with Defendants, sometime in the months of August 2007 (FAC, ¶33), February 2008 (FAC, ¶34), August 2008 (FAC, ¶35), February 2009 (FAC, ¶36), December 2009 (FAC, ¶37), and February 2010 (FAC, ¶38). The FDIC, however, fails to identify which, if any of the directors, the regulators contacted, the actual dates of the communications, or the specifics of those communications. The FDIC has failed to allege that Davolt received notice of the communications from the regulators or reviewed any of those communications, either individually or at a meeting of the

Board.  Further, the FDIC has failed to connect any of the six separate communications with any of the eight allegedly problematic loans.  There is no indication in the FAC whether any of the alleged problem loans were individually examined by the regulators, whether the so-called "Loss Loans" were ever specifically referred to in the regulatory warnings, or whether these regulatory warnings included a recommendation with respect to these "Loss Loans" that Davolt and the Board failed to act upon.

The FDIC simply makes the conclusory statement that the Defendants were informed of these regulatory warnings.  FAC, ¶¶32, 114.  The FDIC provides no facts which would indicate that Davolt consciously or intentionally acted or failed to act after learning of the regulators' concerns.  Notably, the bare-bones allegations setting forth the regulators' communications with the Defendants do not indicate that there was any illegal or improper action taken by the Bank or any individual officers or directors.  Accordingly, the FDIC fails to state a claim that Davolt acted improperly in response to some vague regulatory warnings, let alone committed a specific act or failed to act in a way that was somehow grossly negligent.

For all these reasons, the FDIC has not alleged a colorable claim for gross negligence against Davolt.  The FAC is devoid of any allegations which would suggest Davolt ever acted even negligently, let alone with intent to avoid knowledge or reckless disregard for her duties.  Further, the FDIC has failed to allege any facts which would rebut the presumptions afforded Davolt and other directors under the Business Judgment Rule, that Davolt should not have relied on the reports of the Loan Committee or other consultants of the Bank, or that Davolt had any obligation to act in response to the alleged regulatory warnings.  The dearth of allegations concerning Davolt's own conduct as an Outside Director demonstrates the inadequacies of the FDIC's claim of gross negligence.

## II.    COUNT VI (NEGLIGENCE) IS BARRED BY THE ILLINOIS BANKING ACT.

As outlined in Section I, *supra*, in detail, the FDIC failed to allege any facts which would give rise to a claim of gross negligence.   Which is "very great negligence."  For the same reason, the FDIC has failed to allege a colorable claim of negligence.  Davolt contends that the FDIC has failed to plead either a claim for negligence or gross negligence.   But even if the FDIC had adequately stated a claim for negligence, such a claim is barred under the Illinois Banking Act.

As a director of the Bank, Davolt cannot be found liable for negligent acts allegedly committed while acting as a director of the Bank because the Bank's shareholders adopted a limitation of director liability provision pursuant to the Illinois Banking Act.  205 ILCS 5/39(b). (2006 Offering Circular, attached as Exhibit A; Confidential Offering Circular dated August 30, 2007, attached hereto as Exhibit B).[1]  Accordingly, the Bank, whose rights the FDIC is seeking to enforce as receiver, has indemnified Davolt from certain liabilities, including negligence.

The Illinois Banking Act specifically permits a bank to exculpate its directors from liability arising from simple negligence or breach of the director's fiduciary duty.   The Act provides:

> State bank may establish that a director is not personally liable to the bank or its shareholders for monetary damages for a breach of the director's fiduciary duty; provided, however, that such provision may not eliminate or limit the liability of a director for any of the following:

---

[1] Although this shareholder resolution adopted pursuant to the Illinois Banking Act is not alleged in the FAC, the FAC does allege that the Bank was "a non-member bank organized under the laws of the State of Illinois."   (FAC, ¶ 5).   In certain circumstances, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."   *Wright v. Associated Insurance Company, Inc.,* 29 F.3d 1244, 1248 (7th Cir. 1994); *Venture Associates Corporation v. Zenith Data Systems Corporation,* 987 F.2d 429, 431 (7th Cir. 1993). Davolt contends that the fact the shareholders adopted a provision limiting director liability pursuant to the Illinois Banking Act is central to the FDIC's claims against the directors, such that this exception to the limitation normally placed on motions pursuant to Rule 12(b)(6) recognized in *Wright* and *Venture Associates* is applicable here.  The Court is being asked to interpret the scope of the directors' duty under Illinois law which has been limited by this shareholder resolution.

11

(1) An act or omission that is grossly negligent.
(2) A breach of the director's duty of loyalty to the bank or its shareholders.
(3) Acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law.
(4) A transaction from which the director derived an improper personal benefit.
(5) An act or omission occurring before the effective date of the provision authorized by this subsection.

205 ILCS 5/39(b) (West 2011). This provision of the Illinois Banking Act outlines the five limited, specific bases of liability for which a bank may not absolve its directors. Simple negligence, as alleged in Count VI, is not one of these excepted causes of action, and so cannot be the basis of any claim against Davolt or the other shareholders.

The Bank's exculpation of Davolt and the other directors for negligence is appropriate to consider on a motion to dismiss because it establishes the standard of care under Illinois law, which is central to the FDIC's claim. *Hecker v. Deere & Co.*, 556 F.3d 575, 579 (7th Cir. 2009) (fiduciary standard under ERISA statute was "central" to case, so summary plan description limiting scope of duty was properly considered on a motion to dismiss). When Davolt was named a director, the Bank, by its charter, agreed to limit Davolt's liability for any acts of simple negligence. As the receiver for the Bank, the FDIC may only bring those claims for which Davolt has not been exculpated by the Bank.

Count VI is specifically titled "Negligence," and by its very terms does not seek liability against Davolt for any allegedly grossly negligent conduct. FAC, p. 30. The FDIC's claim of gross negligence against Davolt is found in Count V. FAC, ¶¶137-141. Similarly, the FDIC does not allege that Davolt breached her duty of loyalty or committed any acts of intentional misconduct or any illegal acts. Perhaps most tellingly, the FDIC does not allege that Davolt derived any personal benefit from any of the complained-of activity. The FDIC only alleges that

12

Davolt was "negligent in failing properly to supervise, oversee and manage the Bank's lending operations." FAC, ¶145. As to Davolt, the FDIC alleges nothing more.

"The complaint must plead these other claims of non-exempt conduct with sufficient particularity to permit the court to reasonably conclude the directors' conduct falls outside the exemption." *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795, 811 (7th Cir. 2003). Here, the FDIC has failed to allege any actions of fraud, bad faith, or illegality by Davolt. In fact, the FAC is devoid of any allegations stating the specific acts taken or not taken by Davolt. The FDIC fails to state such facts that would permit the Court to find Davolt acted in a manner so as to avoid the protections of the Bank's limitation of liability for its directors. By failing to allege Davolt acted fraudulently, in bad faith, or illegally, the FDIC has failed to state an actionable claim against Davolt. Accordingly, Count VI should be dismissed, with prejudice, as to Davolt.

## CONCLUSION

This is not an instance where a receiver has hastily filed a claim to preserve a cause of action against a corporate officer or director. Here, more than a year after being appointed receiver, the FDIC sought to amend the Bank's pleadings in this consolidated litigation by adding Davolt as an additional defendant, solely under a theory that she, as an Outside Director, failed to supervise the Bank's lending activities. The fact that this is the best the FDIC could come up with -- after a year of pouring over the Bank's records and after invoking the statutory powers of the FDIC to obtain cooperation and information from current and former Bank employees -- should speak volumes to this Court. After expending so much time and energy, the FDIC should simply not get a "do-over."

For the foregoing reasons, Defendant, Mary Davolt respectfully requests that the Court dismiss Counts V and VI of the FDIC's First Amended Complaint, with prejudice.

Dated:   June 23, 2011

RESPECTFULLY SUBMITTED,

DEFENDANT MARY DAVOLT

BY:   /s/ Evan J. Haim

Kelly McCloskey Cherf
Patrick E. Deady
Evan J. Haim
HOGAN MARREN, LTD.
180 N. Wacker Drive, Suite 600
Chicago, IL  60606
312-946-1800

# EXHIBIT A



# WHEATLAND BANK

In Organization                    *Our Interest is Local.*

## OFFERING CIRCULAR

**$12,399,000 – $15,399,000**

## WHEATLAND BANK
**(In Organization)**

**Offering**
Minimum – 1,239,900 Shares
Maximum – 1,539,900 Shares

**Common Stock**
$10.00 Per Share

**Minimum Purchase**
10,000 Shares – $100,000

**Maximum Purchase**
100,000 Shares – $1,000,000

**Anticipated Closing Date**
December 1, 2006

*3108 S. Route 59, Suites 124-218 Naperville, IL 60564* **t** 630.848.8080 **ƒ** 630.848.8090

The Stock Incentive Plan is intended to promote equity ownership of the Bank by directors and selected officers and employees of the Bank, to increase their proprietary interest in the success of the Bank and to encourage them to remain in the service or employ of the Bank. Any issuance of stock under the Stock Incentive Plan will have a dilutive effect on the ownership interests of the Bank's other stockholders. *See* "Management Remuneration – Stock Incentive Plan." The number of shares reserved for issuance pursuant to the Subscription Warrants (195,075 shares), plus the number of shares the Bank's board of directors intends to reserve for issuance under the Stock Incentive Plan, will not exceed the greater of 225,000 shares or 15% of the total number of shares issued and outstanding after the closing of this Offering.

The Organizers believe that the reservation of shares of Common Stock for issuance pursuant to the exercise of options and the approval of the proposed Stock Incentive Plan will help the Bank remain competitive in its ability to attract qualified directors and employees and will positively affect the ability of its directors and employees to make the best decisions of which they are capable. Accordingly, the Organizers intend to utilize the executed forms of the Stockholder Proxy received from subscribers to amend the Charter to provide for authorized but unissued capital stock reserved for issuance under the Stock Incentive Plan and to adopt the Stock Incentive Plan.

***Limitation of Director Liability.*** The Illinois Banking Act permits an Illinois bank to provide for the elimination of or a limitation on directors' exposure to liability for monetary damages for breaches of their fiduciary duty of care as directors. The Illinois Banking Act does not eliminate directors' liability for an act or omission that is grossly negligent, monetary damages for breach of the duty of loyalty to the bank they serve or its stockholders, acts or omissions not in good faith or involving intentional misconduct or a knowing violation of law, the improper purchase or redemption of stock, payment of improper dividends or other distributions or any transaction from which a director received an improper personal benefit. In addition, the provision does not apply to claims made against directors by third parties or to persons who are officers as well as directors when acting in their capacities as officers. This provision is similar to the protection offered by the Illinois Business Corporation Act to directors of Illinois corporations.

While the proposal limits the right of stockholders and the Bank to sue the directors for monetary damages for a breach by the directors of their fiduciary duty of care, it does not change or eliminate that duty. It only eliminates monetary damage awards occasioned by certain breaches of that duty. The Organizers believe that the diligence and care exercised by directors stem primarily from their desire to act in the best interests of the Bank and not from a fear of monetary damage awards. Therefore, the Organizers believe that the level of care and diligence exercised by directors will not be lessened by adopting this proposal.

In discharging their responsibility for managing the business and affairs of a bank, directors are held under Illinois law to the fiduciary duties of care and loyalty to the bank and its stockholders. The duty of loyalty that directors owe to a bank and its stockholders requires that the directors act in good faith and in the honest belief that any business decision made by them is in the best interests of the bank and that they not engage in self-dealing.

Under this proposal, the Bank and its stockholders will not be able to recover monetary damages based on a claim of breach of the directors' fiduciary duty of care unless the conduct falls within the statutory limitations. The Bank and the stockholders will, however, retain the right to pursue equitable remedies, such as an injunction or rescission of a contract. A remedy such as an injunction may not be effective though, particularly if the stockholders are not aware of a transaction until it is completed.

If the Illinois legislature expands the coverage of the Illinois Banking Act, the coverage offered by the proposal will likewise automatically be expanded without further stockholder action. The proposal will have no effect on the liability of the directors for violations of the federal securities laws or other statutory liabilities. This proposal is not being brought forth in response to any specific refusal to serve by any potential director if this proposal is not adopted by stockholders.

The Organizers believe that this proposal will help the Bank remain competitive in its ability to attract qualified directors and will positively affect the ability of its directors to make the best decisions of which they are

capable. Accordingly, the Organizers intend to utilize the executed forms of the Stockholder Proxy received from subscribers to limit director liability as permitted by the Illinois Banking Act.

*Required Vote.* Holders of not less than two-thirds of the total number of shares of Common Stock subscribed for must affirmatively vote to provide for authorized but unissued shares of Common Stock to be reserved for issuance under the Stock Incentive Plan and to limit the Bank directors' exposure to liability for monetary damages for breaches of their fiduciary duty of care as directors. The Stock Incentive Plan must be approved by holders of not less than a majority of the Bank's Common Stock.

## Effect on Subscriptions

The results of voting indicated on the Subscriber Proxy or the Stockholder Proxy will have no effect on the acceptance or rejection of subscriptions.

# DIVIDEND POLICY

The Bank initially expects that all Bank earnings, if any, will be retained to finance the growth of the Bank and that no cash dividends will be paid for the foreseeable future. Moreover, investors should also note that as a result of the substantial start-up expenses that must be incurred by a new bank, the Bank can be expected to incur operating losses during at least its first two to three years of operations and it will probably have no profits during this time for distribution as dividends.

The FDIC and the DFPR are each statutorily authorized to determine whether the payment of dividends by the Bank would constitute an unsafe and unsound banking practice. In such an instance, either the FDIC or the DFPR could prohibit the payment of dividends. In addition, the Bank's obligation to maintain a tangible Tier 1 capital to total assets ratio of not less than 10% during its first three years of operations may also restrict the ability of the Bank to pay any dividends during this time period. *See* "Supervision and Regulation – The Bank – Dividend Payments."

# THE BANK

## Organization

On June 1, 2006, the Organizers filed with the DFPR an application for a permit to organize a state bank (the "State Application"). Upon the filing of an application for a permit to organize a state bank, the DFPR is required to investigate the truth of the statements made in the application and to consider certain other factors set forth in the Illinois Banking Act. The DFPR may not approve the charter of a new bank unless it finds with respect to the proposed bank that: (i) it has met the minimum capital requirements established by the DFPR; (ii) it has favorable future earnings prospects; (iii) the general character of its proposed management is such as to assure reasonable promise of successful, safe and sound operation; (iv) its name is not the same as or deceptively similar to the name of any other bank then operating in the State of Illinois; and (v) the convenience and needs of the area sought to be served by the proposed bank will be promoted.

The DFPR approved the State Application and issued a Permit to Organize the Bank on September 29, 2006. Once the additional organizational steps specified in the Illinois Banking Act have been completed, the Bank has been fully capitalized and the DFPR is satisfied that all of the other requirements of the Illinois Banking Act have been met, the DFPR will issue a charter authorizing the Bank to commence business as authorized by the Illinois Banking Act.

The Organizers also filed with the FDIC on June 1, 2006, an application for federal deposit insurance (the "FDIC Application"). The Organizers expect that the FDIC will approve or at least conditionally approve the FDIC Application before the conclusion of this Offering. The approval of the FDIC is expected to be granted subject to the satisfaction of certain conditions, among other things: (i) establishing paid-in-capital of the Bank of not less than $15,000,000; (ii) obtaining an annual audit of its financial statements by an independent public

# EXHIBIT B

CONFIDENTIAL OFFERING CIRCULAR

# WHEATLAND BANK

### The date of this Offering Circular is August 30, 2007.

This Confidential Offering Circular (this "Offering Circular") contains information about the business of Wheatland Bank, an Illinois-chartered commercial bank with its main office located in Naperville, Illinois (the "Bank"). This Offering Circular is to be used only by the person to whom it is given so that the recipient can evaluate an investment in the securities of the Bank. By accepting this Offering Circular, the recipient agrees to keep it completely confidential and acknowledges that he or she is not permitted to give it to anyone else or to copy all or any part of it without the Bank's prior written consent. The recipient further agrees that he or she will return this Offering Circular to the Bank upon its request.

The Bank is offering to its shareholders as of the date of this Offering Circular (the "Shareholders") 3,200,000 of its shares, with a stated value of $1.00 per share (the "Shares"), at a price of $12.50 per Share. Pursuant to the Illinois Banking Act (the "Illinois Act"), each of the Shareholders has pre-emptive rights (the "Rights") that entitle him or her to purchase in this pre-emptive rights offering (the "Rights Offering") the number of Shares which is equal to his or her proportionate ownership of the Bank's currently outstanding Shares. If, for example, a Shareholder owns 21,415 (1%) of the Bank's 2,141,504 outstanding Shares, the Shareholder would be entitled to purchase in the Rights Offering up to 32,000 Shares (1% x 3,200,000 = 32,000). To ensure that no more than 3,200,000 Shares are subscribed for by Shareholders, fractions must be rounded down to the nearest whole number.

If any of the Shares offered in the Rights Offering remain unsold after the satisfaction of all purchase requests by the Shareholders (or their permitted assignees as described below), the Bank intends to offer any remaining Shares to selected shareholders of the general public ("Other Purchasers") in a community offering (the "Community Offering"). The minimum investment in the Community Offering will be 8,000 Shares ($100,000). The Bank reserves the right, in its absolute discretion, to accept or reject, in whole or in part, any or all subscriptions for Shares in the Community Offering, either at the time of receipt of an order or at any time thereafter prior to consummation or termination of the Community Offering. The Rights Offering and the Community Offering are sometimes collectively referred to as the "Offerings." The Shares offered by the Bank are being sold on a best efforts basis and no aggregate minimum number of Shares must be sold before the Bank may conclude the Offerings and use the proceeds. Pending the closing or the termination of the Offerings, the Bank will deposit all subscription amounts received from the Shareholders or the Other Purchasers in an escrow account at the Bank. *See* "PLAN OF DISTRIBUTION." The purchase of Shares involves a certain degree of risk and these risks should be considered carefully prior to making any investment. *See "RISK FACTORS" beginning on page 8 of this Offering Circular.*

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE NOT SAVINGS ACCOUNTS OR DEPOSITS AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION, ANY OTHER GOVERNMENTAL AGENCY OR OTHERWISE.

|  | Purchase Price | Proceeds to Bank[1] |
|---|---|---|
| Per Share | $12.50 | $12.50 |
| Total | $40,000,000 | $40,000,000 |

(1) Excludes expenses incurred in connection with the Offerings, which are estimated at $30,000.

Plan could not exceed 15% of the number of Shares sold in the Offerings. Accordingly, the number of shares reserved under the Incentive Plan may be reduced upon the conclusion of the Offerings, depending upon how many Shares are sold in the Offerings, and this reduction will also be reflected in a reduction in the number of authorized shares in the Charter.

When issued, Shares sold in the Offerings will be fully paid and non-assessable. Other than in connection with grants under the Incentive Plan, the Bank may not authorize and issue additional Shares without the prior approval of the Bank's shareholders and regulatory authorities.

PREEMPTIVE RIGHTS

The holders of Shares have preemptive rights that permit them to subscribe to purchase any newly issued Shares, except for any Shares issued pursuant to the Incentive Plan.

DIVIDEND RIGHTS

The holders of Shares are entitled to distributions when, as and if declared by the Bank's board of directors out of funds legally available therefor. Under Illinois law, the Bank is prohibited from paying dividends in excess of its net profits, after first deducting its losses (including any accumulated deficit) and bad debts. In addition, the FDIC restricts dividend payments during the first three years of a new bank's operations, allowing cash dividends to be paid only from net operating income and does not permit dividends to be paid until an appropriate allowance for loan and lease losses has been established and overall capital is adequate. Regardless of regulatory considerations, the Bank expects that all Bank earnings will be retained to finance the growth of the Bank and that no cash dividends will be paid for the foreseeable future. No assurance can be given that cash dividends will ever be declared or, if declared, of the amount or timing of any such dividend payments. *See* "DIVIDEND POLICY."

VOTING RIGHTS

Holders of Shares are entitled to one vote for each Share held by them with respect to all matters subject to Shareholder vote, including the election of directors.

ELECTION OF DIRECTORS

The Bank's directors are elected annually, and there is no cumulative voting for the election of directors.

LIMITATION OF DIRECTOR LIABILITY

The Illinois Act permits banks to eliminate or limit directors' exposure to liability for monetary damages for breaches of their fiduciary duty of care as directors. The Illinois Act does not eliminate directors' liability for monetary damages for breach of the duty of loyalty to the bank they serve or its shareholders, acts or omissions not in good faith or involving intentional misconduct or a knowing violation of law, the improper purchase or redemption of Shares, payment of improper dividends or any transaction from which a director received an improper personal benefit. In addition, the provision does not apply to claims made against directors by third parties or to persons who are officers as well as directors when acting in their capacities as officers. The Bank's shareholders have adopted this provision limiting director liability.

CHARTER AMENDMENTS; MERGER, DISSOLUTION AND SALES

Amendments to the Charter require approval of the holders of at least two-thirds of the outstanding Shares entitled to vote at a meeting of the Bank's shareholders. A vote of holders of at least two-thirds of the outstanding Shares is also required to approve a merger, consolidation or dissolution of the Bank, or sale of all or substantially all of its assets not in the ordinary course of business.

A-13