**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR WHEATLAND BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 10 CV 4288 |
| | ) | Hon. Robert M. Dow, Jr. |
| v. | ) ) | |
| LEWIS MARK SPANGLER, ARTHUR P. SUNDRY, JR., MICHAEL A. SYKES, LEONARD EICHAS, FRANK MALY, DOLORES RITTER, MARY DAVOLT, BEVERLY HARVEY, MICHAEL REES, and NORMAN BELES, | ) ) ) ) ) ) ) | JURY TRIAL REQUESTED |
| Defendants. | ) ) | |

**PLAINTIFF FEDERAL DEPOSIT INSURANCE**
**CORPORATION AS RECEIVER FOR WHEATLAND BANK'S**
**CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

PROCEDURAL HISTORY ................................................................................................. 3

FACTUAL BACKGROUND .............................................................................................. 4

ARGUMENT ...................................................................................................................... 7

I.    Defendants Mischaracterize the Applicable Pleading Standard ....................................... 7

II.   Illinois Law Holds Officers and Directors Liable for Failing to Satisfy the Standard of Care and Breaching Their Duties to the Bank ............................................. 10

III.  The Complaint Sufficiently Pleads Claims for Gross Negligence, Negligence and Breach of Fiduciary Duty of Care Against the Loan Committee Defendants for Approval of the Loss Loans .......................................................................................... 11

   A.   The Complaint Exceeds Rule 8's Minimal Notice Pleading Requirements ........ 12

   B.   The Complaint Plausibly Alleges That Approval of Each Loan Was Grossly Negligent ............................................................................................ 14

   C.   The Loan Committee Defendants Had a Heightened Duty of Care ................... 16

IV.   The Complaint Sufficiently Pleads Claims for Gross Negligence and Negligence Against the Director Defendants For Failure to Supervise the Bank's Risky Lending ....................................................................................................................... 17

   A.   Complaint Pleads Red Flags Known to All Directors and Their Collective Failure to Supervise Risky Lending Activities ................................................. 18

   B.   Illinois Law Applies to FDIC-Receiver's Claims For Failure to Supervise ........ 20

   C.   The Director Defendants Received Ample Notice Of Unsafe and Unsound Lending Practices But Failed To Act .............................................................. 22

   D.   The Director Defendants Cannot Excuse Their Failure to Supervise By Claiming Reliance on Management and Consultants ......................................... 25

V.    The Loan Committee Defendants' Approval of Preferential Loans to Bank Shareholders, Against the Best Interests of Wheatland, Breached Their Fiduciary Duty of Loyalty ........................................................................................................... 26

VI.   Proximate Cause Has Been Sufficiently Alleged for Every Loss Loan. ........................ 28

   A.   Proximate Cause is a Fact Issue Inappropriate for Disposition on a Motion to Dismiss ............................................................................................... 28

   B.   The Complaint Alleges Sufficient Facts, Known at the Time the Loss Loans were Approved, to Demonstrate Proximate Cause ................................. 29

## TABLE OF CONTENTS
### (continued)

**Page**

VII. Business Judgment Rule Does Not Bar The FDIC-Receiver's Claims for Gross Negligence, Negligence and Breach of Fiduciary Duties ................................................. 30

    A. The Business Judgment Rule is a Fact Intensive Inquiry Ill Suited to Resolution on a Motion to Dismiss ........................................................................ 30

    B. In Any Event, The Complaint Pleads Lack of Due Care Defeating The Business Judgment Rule At The Motion to Dismiss Stage ................................. 32

VIII. The Breach of Fiduciary Duty Claim is Not Duplicative ................................................. 33

IX. The Narrow Illinois Banking Act Exemption for Director Liability Does Not Shield Defendants From FDIC-Receiver's Claims ........................................................... 34

    A. The Illinois Banking Act Exemption Does Not Apply to Gross Negligence or Breach of the Duty of Loyalty ........................................................ 34

    B. The Illinois Banking Act Exemption Is Limited To Directors Acting Solely in Their Capacity as Directors of Wheatland ............................................ 35

    C. Defendants Have Not Met Their Burden to Show When the Claimed Exemption Went Into Effect ............................................................................... 36

    D. Section 5/39(b) Does Not Apply to Claims Brought by FDIC-Receiver ............ 37

CONCLUSION ......................................................................................................................... 40

CERTIFICATE OF SERVICE .................................................................................................. 41

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford*,
554 F. Supp. 2d 538 (D. Del. 2008) ................................................................................. 30

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ....................................................................................................... 8

*Atherton v. Anderson*,
99 F.2d 883 (6th Cir. 1938) ............................................................................................. 24

*Atherton v. FDIC*,
519 U.S. 213 (1997) ......................................................................................................... 10

*Barnes v. Briley*,
420 F.3d 673 (7th Cir. 2005) ............................................................................................. 8

*Batteast Const. Co., Inc. v. Public Bldg. Comm'n of Chicago*,
195 F. Supp. 2d 1045 (N.D. Ill. 2001) ............................................................................ 18

*Beavers v. Walsh*,
No. 06-2121, 2007 WL 2681098 (C.D. Ill. Aug. 27, 2007) ........................................... 33

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................................... 7, 8

*Briggs v. Spaulding*,
141 U.S. 132 (1891) ......................................................................................................... 10

*Cat Iron, Inc. v. Bodine Env. Servs., Inc.*,
No. 10-CV-2102, 2010 U.S. Dist. LEXIS 102191 (C.D. Ill. Sept. 28, 2010) ................. 39

*Cement-Lock v. Gas Tech. Inst.*,
523 F. Supp. 2d 827 (N.D. Ill. 2007) ......................................................................... 20, 22

*Chicago Title & Trust Co. v. Munday*,
131 N.E. 103 (Ill. 1921) .................................................................................................. 34

*Cordial v. Ernst & Young*,
483 S.E.2d 248 (W. Va. 1996) ......................................................................................... 38

*Dahlin v. Evangelical Child & Family Agency*,
No. 01 C 1182, 2002 WL 31557625 (N.D. Ill. Nov. 15, 2002) ...................................... 33

*Davis v. Dyson*,
900 N.E.2d 698 (Ill. App. Ct. 2008) ............................................................................... 32

*Donovan v. ABS-NACO Inc.*,
No. 02 C 1951, 2002 WL 1553259 (N.D. Ill. July 15, 2002) ............................................ 9

*EEOC v. Concentra Health Servs., Inc.*,
496 F.3d 773 (7th Cir. 2007) ........................................................................................... 8

*Erickson v. Pardus*,
551 U.S. 89 (2007) ........................................................................................................... 8

*FDIC v. Bierman*,
2 F.3d 1424 (7th Cir. 1993) ................................................................................... passim

*FDIC v. Brickner*,
747 F.2d 1198 (8th Cir. 1984) ....................................................................................... 24

*FDIC v. Gravee*,
966 F. Supp. 622 (N.D. Ill. 1997) ......................................................................... passim

*FDIC v. Miller*,
781 F. Supp. 1271 (N.D. Ill. 1991) ............................................................................... 28

*FDIC v. O'Melveny & Myers*,
61 F.3d 17 (9th Cir. 1995) ............................................................................................. 38

*First Nat'l Bank of Lincolnwood v. Keller*,
318 F. Supp. 339 (N.D. Ill. 1970) ................................................................................. 14

*Foman v. Davis*,
371 U.S. 178 (1962) ....................................................................................................... 40

*Gibson v. City of Chicago*,
910 F.2d 1510 (7th Cir. 1990) ......................................................................................... 7

*Gould Elec. Inc. v. United States*,
220 F.3d 169 (3rd Cir. 2000) ......................................................................................... 36

*Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*,
971 F.2d 1332 (7th Cir. 1992) ....................................................................................... 33

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ......................................................................................... 36

*In re 1st Rochdale Co-Op Group, Ltd.*,
No. 07 Civ. 7852 (DC), 2008 WL 170410 (S.D.N.Y. Jan. 17, 2008) ............................. 31

*In re Abbott Lab. Derivative S'holder Litig.*,
325 F.3d 795 (7th Cir. 2003) ......................................................................................... 22

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996)..................................................................... 21, 22

*In re Citigroup Inc. S'holders Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009)..................................................................... 21, 22

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................. 22

*In re Fleming Packaging Corp.*,
    370 B.R. 774 (Bankr. C.D. Ill. July 11, 2007) ................................................... 30

*In re ITT Corp. Derivative Litig.*,
    588 F. Supp. 2d 502 (S.D.N.Y. 2008).............................................................. 13

*In re ITT Corp. Derivatives Litig.*,
    653 F. Supp. 2d 453 (S.D.N.Y. 2009)................................................................ 8

*In re Odeh*,
    431 B.R. 807 (N.D. Ill. 2010) ......................................................................... 33

*Johnson v. Tellabs, Inc.*,
    262 F. Supp. 2d 937 (N.D. Ill. 2003) ................................................................ 9

*Kinzer v. City of Chicago*,
    539 N.E.2d 1216 (Ill. 1989) ........................................................................... 33

*Labor Ready, Inc. v. Williams Staffing, LLC*,
    149 F. Supp. 2d 398 (N.D. Ill. 2001) .............................................................. 27

*LeBlanc v. Bernard*,
    554 So.2d 1378 (La. Ct. App. 1989)................................................................. 39

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ........................................................................... 9

*Maercker Point Villas Condo. Assoc. v. Szymski*,
    655 N.E.2d 1192 (Ill. App. Ct. 1995) ............................................................ 27

*Massa v. Dep't of Reg. & Educ.*,
    507 N.E.2d 814 (Ill. 1987) ...................................................................... 10, 15

*McRaith v. BDO Seidman, LLP*,
    909 N.E.2d 310 (Ill. App. Ct. 2009) .............................................................. 38

*Murphy v. Candor*,
    No. 8,289, 1931 WL 3142 (Ill. App. Ct. 1931)................................................. 34

*Neade v. Portes*,
    739 N.E.2d 496 (Ill. 2000) ........................................................................ 33

*Nobles v. White Cnty.*,
    973 F.2d 544 (7th Cir. 1992) .................................................................... 30

*Ohlendorf v. Rathje*,
    No. 7,061, 1923 WL 3327 (Ill. App. Ct. 1923)........................................ 20

*Palay v. U.S.*,
    349 F.3d 418 (7th Cir. 2003) .................................................................... 28

*Rivera v. Garcia*,
    927 N.E.2d 1235 (Ill. App. Ct. 2010) ...................................................... 28

*Romanik v. Lurie Home Supply Ctr., Inc.*,
    435 N.E.2d 712 (Ill. App. Ct. 1982) ........................................................ 27

*RTC v. Acton*,
    844 F. Supp. 307 (N.D. Tex. 1994) .......................................................... 13

*RTC v. Fortunato*,
    No. 94 C 2090, 1994 U.S. Dist. LEXIS 12326 (N.D. Ill. Aug. 31, 1994) ........................ 15

*RTC v. Franz*,
    909 F. Supp. 1128 (N.D. Ill. 1995) ..................................................... 14, 15

*RTC v. Keefe*,
    No. 92-3207, 1993 U.S. Dist. LEXIS 17701 (C.D. Ill. Feb. 19, 1993) .................... passim

*RTC v. Lucas, et al.*,
    No. 92-1317, 1993 U.S. Dist. LEXIS 9892 (C.D. Ill. Mar. 25, 1993)................. 30, 32, 33

*RTC v. O'Connell*,
    No. 94 C 4186, 1996 U.S. Dist. LEXIS 3999 (N.D. Ill. Apr. 1, 1996)............................ 15

*Seidel v. Byron*,
    405 B.R. 277 (N.D. Ill. 2009) ................................................................. 32

*Sherman v. Ryan*,
    911 N.E.2d 378 (Ill. App. Ct. 2009) ...................................................... 9, 20

*Stamp v. Touche Ross & Co.*,
    636 N.E.2d 616 (Ill. App. Ct. 1993) ................................................... 9, 31, 32

*Starrels v. First Nat'l Bank*,
    870 F.2d 1168 (7th Cir. 1989) .................................................................. 9

*Talton v. Unisource Network Servs., Inc.*,
    No. 00 C 7967, 2004 WL 2191605 (N.D. Ill. 2004) ...................................... 31

*Velo Corp. v. Babcock*,
    611 N.E.2d 1054 (Ill. App. Ct. 1993) ............................................................ 27

*Washington Bancorp. v. Said*,
    812 F. Supp. 1256 (D.D.C. 1993) .................................................... 11, 19, 20

*Wojtas v. Capital Guardian Trust Co.*,
    477 F.3d 924 (7th Cir. 2007) ........................................................................ 33

*Zuidema v. Raymond Christopher, Inc.*,
    No. 11-CV-306, 2011 WL 2647993 (N.D. Ill. June 30, 2011) ......................... 8

## <u>STATUTES AND COURT RULES</u>

12 CFR § 364 ..................................................................................................... 6

12 CFR § 365 ..................................................................................................... 6

12 U.S.C. § 1821(d)(2)(A) ................................................................................ 37

12 U.S.C. § 1821(d)(2)(A)(i) .............................................................................. 3

12 U.S.C. § 1821(d)(2)(B)(ii) ............................................................................. 3

12 U.S.C. § 1821(d)(10) ................................................................................... 37

12 U.S.C. § 1821(d)(11) ............................................................................... 3, 37

12 U.S.C. § 1821(d)(11)(A)(v) ......................................................................... 38

12 U.S.C. § 1821(k) .................................................................................... 10, 15

205 ILCS § 5/16(7)(b) ..................................................................................... 25

205 ILCS § 5/39(a) .......................................................................................... 35

205 ILCS § 5/39(b) ..................................................................................... passim

205 ILCS § 5/39(b)(1) ................................................................................ 34, 35

205 ILCS § 5/39(b)(2) ................................................................................ 34, 35

205 ILCS § 5/39(b)(3) ..................................................................................... 34

205 ILCS § 5/39(b)(4) ..................................................................................... 34

205 ILCS § 5/39(b)(5) ................................................................................ 35, 37

Delaware Rule 23.1(b)(3) .................................................................................. 9

Fed. R. Civ. P. 8 ......................................................................... 8, 12, 13, 29

Fed. R. Civ. P. 8(a)(2) ..................................................................................... 7

Fed. R. Civ. P. 8(d)(2) ................................................................................... 34

Fed. R. Civ. P. 9(b) .......................................................................................... 9

Fed. R. Civ. P. 10(c) ...................................................................................... 18

Fed. R. Civ. P. 12(b)(6) .......................................................................... passim

Fed. R. Civ. P. 23.1 ....................................................................................... 13

## OTHER AUTHORITIES

FDIC, Office of Inspector General, Report No. IDR -11-005, *In-Depth Review of the
Failure of Wheatland Bank, Naperville, Illinois* (January 2011), *available at*
http://www.fdicoig.gov/reports11%5C11-005IR.pdf ......................................... 24, 25

Plaintiff Federal Deposit Insurance Corporation, as Receiver for Wheatland Bank ("FDIC-Receiver"), by its undersigned attorneys, hereby submits the following Memorandum of Law in response to Defendant Mary Davolt's Motion to Dismiss ("Davolt Brf.") and the Joint Motion to Dismiss the First Amended Complaint ("Defs' Joint Brf.") of Defendants Lewis Mark Spangler, Arthur P. Sundry, Jr., Michael A. Sykes, Frank Maly, Dolores Ritter, Mary Davolt, Beverly Harvey, Michael Rees and Norman Beles (collectively the "Defendants").[1]

## INTRODUCTION

This case is about the utter failure of the officers and directors of Wheatland Bank ("Wheatland" or "Bank") to perform their fiduciary obligations to the Bank with the required care. Wheatland managed to survive in business for barely over three years. Almost immediately upon opening, Wheatland ignored its own business plan and dangerously over-concentrated its loans in a small number of borrowers engaged in risky commercial real estate development. Despite early and repeated regulatory warnings to diversify Wheatland's risk and slow its unsustainable loan growth, Defendants continued to authorize risky loans that heightened the Bank's exposure to commercial real estate and resulted in its collapse. As a result, Wheatland was shut down by state regulatory authorities in April 2010 and the FDIC was appointed as receiver.

The First Amended Complaint ("Complaint") details Defendants' repeated violation of Wheatland's loan policies and business plans, failure to follow regulatory warnings to alter Wheatland's lending and credit administration practices and failure to curb the Bank's risky lending approach. The Complaint focuses on eight unsafe and unsound loans, pleads facts detailing why approval of each loan was grossly negligent, identifies the particular Wheatland

---

[1] Defendant Leonard Eichas moved to join Defendants' joint motion to dismiss, but that motion has not yet been ruled upon. (Dkt. 81.)

Loan Committee ("Loan Committee") members who approved each loan and alleges the resulting loss. Common underwriting omissions for these loans included failure to assess the repayment ability of borrowers, failure to secure sufficient financial information or even appraisals, the allowance of generous interest reserves without consideration of borrower creditworthiness and granting excessively risky loans for development of distressed property and raw land and loans exceeding permitted loan to value ("LTV") ratios. Many of these loans were made to Wheatland shareholders on preferential terms in violation of the Loan Committee's duty of loyalty.

The Complaint further alleges that Wheatland's directors failed to address the systemic problems in the Bank's credit administration and lending practices. Wheatland's directors ignored monthly internal reports and periodic regulatory reviews showing the Bank's undue concentration in overly speculative construction lending and rapid loan growth well in excess of its business plans. Those business plans were submitted to federal regulators and a condition of the grant of federal deposit insurance was continuing compliance with those plans. Despite the Bank's nascent status and these early and repeated warnings of risky lending, Wheatland's directors took no action to address the Bank's unjustified exposure to speculative real estate development loans or to strengthen its underwriting process. As a result, Wheatland continued to make grossly negligent loans, including the loans identified in the Complaint, which resulted in excess of $22 million in damages.

Defendants principally argue that greater specificity is needed in support of these claims. However, Defendants rely on heightened pleading standards that are inapplicable to the claims at issue and ignore the factual allegations in the Complaint showing that Wheatland's officers and directors were on notice of significant lending problems, but failed to address the situation.

Defendants' frequent resort to introducing and arguing "facts" not in the Complaint, which is improper on a motion to dismiss, demonstrates the weakness of their position.  By any measure, the Complaint provides far more detailed allegations than the minimal burden imposed by Rule 8(a).

## PROCEDURAL HISTORY

On April 23, 2010, the FDIC accepted its appointment as receiver for Wheatland, which was closed by the Illinois Department of Financial and Professional Regulation ("IDFPR"). (Compl., ¶ 31.)  Pursuant to that appointment, FDIC-Receiver succeeded to all rights, titles, powers and privileges of the Bank, stockholders, depositors and other parties interested in the affairs of the Bank.  *See* 12 U.S.C. § 1821(d)(2)(A)(i) (2010).  As receiver, the FDIC is charged with collecting monies owed the institution and distributing the funds to the creditors of Wheatland under a statutorily authorized scheme.  *See* 12 U.S.C. §§ 1821(d)(2)(B)(ii); 1821(d)(11).  Congress specifically authorized the FDIC acting as receiver to pursue claims against directors and officers of failed banks for breach of the applicable duty of care.  *See* 12 USC § 1821(k).

In July 2010, FDIC-Receiver was substituted for Wheatland in two lawsuits pending in the Circuit Court of Cook County and removed those cases to this Court.  The first was filed by Wheatland in December 2009 against Michael Sykes, Arthur Sundry, and other parties and alleged breach of fiduciary duty, tortious inducement of breach of fiduciary duty, fraud, negligence, conspiracy, and deceptive trade practices.  (*See Wheatland Bank v. Michael A. Sykes, et al.,* Case No. 09-L-15546; upon removal, Case No. 1:10-cv-04687.)  The second suit was a shareholder derivative action filed by Michael Sykes in May 2010 against Mark Spangler and other former directors, asserting claims of breach of fiduciary duty, gross mismanagement, waste

of corporate assets, and negligence. (*See Michael A. Sykes v. L. Mark Spangler, et al.*, Case No. 10-L-5634; upon removal, Case No. 1:10-cv-04288.)

On May 5, 2011, Judge Hart consolidated these cases, after substituting FDIC-Receiver as plaintiff in the *Sykes v. Spangler* matter, and granted FDIC-Receiver leave to file an amended complaint. (Case No. 10-cv-04288, Dkt. 33.) The Complaint thereafter was filed (Dkt. 29) and Defendants' Motions to Dismiss followed. The Complaint was the first substantive pleading filed by the FDIC-Receiver in this case.

## FACTUAL BACKGROUND

Wheatland opened for business on February 5, 2007 and on April 23, 2010, after only three years of operation, the IDFPR closed the Bank and appointed the FDIC as Receiver. (Compl., ¶¶ 23; 31.) At the time of its failure, Wheatland had assets of $441.6 million. Its failure resulted in an estimated loss to the FDIC Deposit Insurance Fund of $136.9 million. (*Id.*, ¶ 31.) Despite early and repeated regulatory warnings of the Bank's excessive growth, heavily concentrated loan portfolio, poor credit administration and lax oversight, the directors and officers of Wheatland continued on an improvident course of asset growth, increased concentrations of high-risk real estate loans, and uncorrected underwriting failures that would result in the massive losses to the Bank. (*Id.*, ¶¶ 30; 32-39.)

Wheatland delegated the authority to approve loans to the Loan Committee. Certain senior officers and directors were members of the Loan Committee. Chairman of the Board Lewis Mark Spangler ("Spangler"), President and CEO Michael A. Sykes ("Sykes"), director Arthur P. Sundry, Jr. ("Sundry"), Chief Lending Officer Leonard Eichas ("Eichas"), director Frank Maly ("Maly") and Chief Financial Officer Dolores Ritter ("Ritter") initially composed the Loan Committee ("Loan Committee Defendants"). These individuals were responsible for

evaluating the adequacy of the underwriting of each loan and voting on whether to approve or reject the proposed loan. (Compl., ¶¶ 6-12; 40-43.)

From its inception, Wheatland adopted an aggressive asset growth strategy that violated the business plan it submitted and committed to follow in order to obtain federal deposit insurance. (Compl., ¶ 23.) After only six months in operation, Wheatland had total assets at levels not projected in its business plan until the second quarter of its second year of operation. (*Id.*) By the end of its second year of operation, Wheatland had extended $401 million in loans, almost five times the loan limit approved by state and federal regulators. (*Id.*, ¶ 24.) This rapid loan growth compromised Wheatland's credit underwriting and administration, eventually leading to loan losses that fatally depleted its capital. (*Id.*)

Wheatland's officers and directors concentrated the Bank's excessive lending in risky commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans, such as the eight loans described in the Complaint ("Loss Loans"). (Compl., ¶¶ 25-29; 40-47; 112-115.) Wheatland's percentage of high-risk real estate loans sharply exceeded that of its peers, prompting immediate and frequent warnings from bank examiners. (*Id.*, ¶¶ 25-26.) These warnings were ignored by the Defendants. Instead, Wheatland's officers and directors permitted the Bank's lending to concentrate in a few individuals, a majority of whom already held adversely classified credits with the Bank. (*Id.*, ¶¶ 29-30.) For example, as of December 31, 2008 – roughly a year and a half after the Bank's founding – ten individuals were obligated on loans that represented 97 percent of Wheatland's total capital and seven of these borrowers had credits that had been adversely classified by examiners. (*Id.*, ¶ 29.) This focus on loan growth over risk diversification and asset quality resulted in large adverse classification levels,

5

substantial charge-offs, and additional provisions to the allowance for loan and lease losses ("ALLL"), all of which significantly depleted Wheatland's capital. (*Id.*, ¶ 39.)

The Loan Committee Defendants failed to follow the Bank's written lending policies and ensure prudent underwriting in approving the Loss Loans. The Loan Committee routinely approved loans without current and complete financial information on the borrower and guarantor and without obtaining a full guarantee on the loans. (Compl., ¶ 43.) Other significant underwriting problems included failing to assess the repayment abilities of borrowers and guarantors, failing to assess creditworthiness before allowing generous interest reserves, and funding loans that were not financially feasible. (*Id.*) Loans were made with excessive LTV ratios in violation of the Bank's loan policies and federal regulatory standards, thereby heightening the Bank's risk. *See, e.g.,* 12 CFR § 364 (setting forth safety and soundness standards) and 12 CFR § 365 (setting forth Interagency Guidelines for Real Estate Lending Policies); (*see also* Compl., ¶ 42.) The Loan Committee Defendants also approved loans where the collateral was impaired, no appraisals had been performed and no title insurance was secured, and then failed to oversee loan draws. (*Id.*, ¶ 43.) Furthermore, Wheatland extended loans to certain shareholders of Wheatland with preferential terms. When these loans failed, Wheatland chose not to pursue repayment from these borrowers and guarantors. (*Id.*, ¶¶ 4; 40-41; 43-45; 113.)

These failings were compounded by the Director Defendants' failure to address repeated regulatory warnings about the state of the Bank, beginning in 2007 through to Wheatland's collapse.[2] (Compl., ¶¶ 30; 32-39; 115.) In its first report of examination in summer 2007, state regulators urged the directors to monitor lending closely due to the Bank's "*de novo* status, rapid

---

[2] The Director Defendants are Spangler, Sykes, Sundry, Maly, Michael Rees ("Rees"), Mary Davolt ("Davolt"), Norman Beles ("Beles") and Beverly Harvey ("Harvey").

loan growth, and the inherent risk associated with CRE and ADC lending." (*Id.*, ¶ 33.) Going forward in 2008 and 2009, federal and state regulators repeatedly cautioned Wheatland's board to address its high CRE and ADC concentrations and excessive growth rate given the Bank's *de novo* status. (*Id.*, ¶¶ 4; 30; 32-39; 115.) Regulators repeatedly criticized Wheatland's inadequate credit underwriting and administration. (*Id.*, ¶¶ 32-36.) The Director Defendants took no action to reform the lending process. As a result, the Bank further deteriorated and, in December 2009, entered into a Consent Order with the FDIC and IDFPR which required the Bank, among other things, to increase Board participation, reduce all loan concentrations and revise and improve its lending policies. (*Id.*, ¶ 37.) In the February 2010 regulatory examination, the FDIC and IDFPR found that the Bank's emphasis on loan growth over diversification and asset quality resulted in significant charge-offs that adversely affected its capital. (*Id.*, ¶ 38.) The FDIC also issued a Prompt Corrective Action letter in February 2010 notifying the Bank that it was critically undercapitalized and requiring it to submit a capital restoration plan by March 15, 2010. (*Id.*, ¶ 39.) It failed to do so and the Bank closed soon thereafter causing substantial losses to the FDIC Deposit Insurance Fund and creditors of the Bank.

## ARGUMENT

### I.    Defendants Mischaracterize the Applicable Pleading Standard.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A complaint must allege "only enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when it contains factual content "that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). The factual allegations in the complaint must only raise the possibility of relief above the speculative level, assuming all of the allegations of the complaint are true. *Twombly*, 550 U.S. at 555; *see also EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). The Court accepts as true all of plaintiff's well-pleaded facts and all reasonable inferences drawn therefrom. *See Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

Defendants rely heavily on Rule 8, asserting that all of the claims pled in the Complaint are vague and therefore subject to dismissal. But Rule 8 does not require the specificity demanded by Defendants. "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555) (omission in original); *see also Zuidema v. Raymond Christopher, Inc.*, No. 11-CV-306, 2011 WL 2647993, at *6 (N.D. Ill. June 30, 2011) (Dow, J.) (complaint "should be 'short and plain' and suffices if it notifies the defendant of the principal events."). "[A] complaint need not contain all of the facts that would be necessary to prevail." *Id.* (quotation omitted). In this case, the Complaint provides ample notice of the underlying claims and the principal events.

Contrary to these liberal pleading standards, Defendants rely upon cases applying heightened pleading requirements that are inapplicable to the FDIC-Receiver's claims.[3] *See, e.g.,* Defs' Joint Brf., at 10-11; 18-19; 21; *In re ITT Corp. Derivatives Litig.*, 653 F. Supp. 2d

---

[3]     Defendant Davolt incorrectly claims that this case is subject to a heightened pleading standard under *Twombly* because it is "very complex and . . . will trigger broad and costly discovery." (Davolt Brf., at 2-3.) Unlike in antitrust claims or class actions, this case is a comparatively focused claim concerning events during the limited time period when the Defendants were in charge of the Bank's operations. Furthermore, the discovery burden falls largely on the FDIC-Receiver as the holder of the Bank's documents. No heightened standard applies.

453, 457 (S.D.N.Y. 2009) (applying heightened pleading requirements for shareholder derivative actions under Rule 23.1(b)(3)); *Starrels v. First Nat'l Bank*, 870 F.2d 1168, 1170-71 (7th Cir. 1989) (applying heightened standard for derivative action); *Stamp v. Touche Ross & Co.*, 636 N.E.2d 616, 620-21 (Ill. App. Ct. 1993) (applying state fact pleading requirements to officer and director claim); *Sherman v. Ryan*, 911 N.E.2d 378, 390 (Ill. App. Ct. 2009) (applying particularized pleading requirements of Delaware Rule 23.1 to show demand futility and requiring showing of "substantial likelihood of liability"); *see also* Davolt Brf. at 4; *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 945-47 (N.D. Ill. 2003) (applying heightened pleading standards of Federal Rule of Civil Procedure 9(b) to securities fraud claim); *Donovan v. ABS-NACO Inc.*, No. 02 C 1951, 2002 WL 1553259, at *4-5 (N.D. Ill. July 15, 2002) (same). None of these heightened standards are applicable here.

In addition to applying incorrect pleading standards, Defendants also make unsupported factual arguments and attempt to introduce evidence outside the pleadings that are not permitted in evaluating motions to dismiss. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 479 (7th Cir. 2002) (matters outside of the pleadings cannot be considered on a Rule 12(b)(6) motion without conversion to summary judgment). Yet Defendants devote pages of their response, without citation to anything, to identifying consultants and auditors used by Wheatland that supposedly excuse their fiduciary breaches. (Defs' Joint Brf., at 21-22.) Defendants also attach charts that they created and selectively quote regulatory documents not mentioned in the Complaint to argue their version of the events. (*Id.*, at 17-18, n.3; 20-21, n.5; Exs. C & D.) These arguments and exhibits have no place in Rule 12(b)(6) briefing and should be disregarded.

## II.     Illinois Law Holds Officers and Directors Liable for Failing to Satisfy the Standard of Care and Breaching Their Duties to the Bank.

The Financial Institutions Reform, Recovery & Enforcement Act ("FIRREA") holds directors and officers of a federally insured depository institution personally responsible for losses arising from their gross negligence as that term is defined under applicable state law.  *See* 12 U.S.C. § 1821(k).   Illinois defines gross negligence as "very great negligence, but . . . something less than . . . willful, wanton and reckless conduct."  *FDIC v. Gravee*, 966 F. Supp. 622, 636 (N.D. Ill. 1997) (quoting *Massa v. Dep't of Reg. & Educ.*, 507 N.E.2d 814, 819 (Ill. 1987)).   Deliberate misconduct is not required.   Moreover, "good faith and lack of motive to injure [will not] exonerate [directors] of liability under the statutory 'gross negligence' standard."  *FDIC v. Gravee*, 966 F. Supp. at 637.   Gross negligence is merely a minimum standard and states may apply stricter standards of conduct for officers and directors.  *See Atherton v. FDIC*, 519 U.S. 213, 227 (1997) (FIRREA "guarantee[s] that officers and directors must meet at least a gross negligence standard," but does not preempt more restrictive state standards).

Illinois imposes a stricter standard holding bank directors and officers liable for ordinary negligence.  *RTC v. Keefe*, No. 92-3207, 1993 U.S. Dist. LEXIS 17701, at *5 (C.D. Ill. Feb. 19, 1993) (acknowledging that negligence is actionable in claims against officers and directors under Illinois law).   Officers and directors are required to exercise "ordinary care and prudence in the administration of the affairs of a bank" in order to meet their duties.  *FDIC v. Bierman*, 2 F.3d 1424, 1432 (7th Cir. 1993) (quoting *Briggs v. Spaulding*, 141 U.S. 132, 165-66 (1891)).   What constitutes "ordinary care and prudence" is a highly fact specific inquiry that depends on the circumstances of both the bank and the director or officer.  *See Briggs*, 141 U.S. at 152 ("the

question of negligence is, therefore, ultimately a question of fact, to be determined under all the circumstances.").

Directors and officers must go beyond "ordinary care" when the circumstances dictate greater attention and action. *See FDIC v. Bierman*, 2 F.3d at 1433 (recognizing a "heightened responsibility among those directors who have an inkling of trouble brewing"). "If . . . directors know, or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible." *Id.* (citation omitted). Defendants' own authority similarly acknowledges that what constitutes ordinary care varies by the circumstances and a heightened standard of care may be applied. *See Washington Bancorp. v. Said*, 812 F. Supp. 1256, 1266 (D.D.C. 1993) ("Thus, the court holds that directors of a bank must satisfy different standards of care depending on the circumstances under which they operate during any given act.").

### III. The Complaint Sufficiently Pleads Claims for Gross Negligence, Negligence and Breach of Fiduciary Duty of Care Against the Loan Committee Defendants for Approval of the Loss Loans.

Counts I through III of the Complaint state claims for gross negligence, negligence and breach of the fiduciary duty of care against the Loan Committee Defendants (Spangler, Sundry, Sykes, Eichas, Maly and Ritter) for their approval of imprudent loans. The Complaint details each person's position and tenure at the Bank, the grossly negligent loans each defendant personally approved, the reasons why those loans were imprudent at the time of approval and the loss suffered by the Bank from the decision to make the loan.[4]

---

[4] Because the Complaint sufficiently pleads a claim for gross negligence, it also properly alleges claims for simple negligence and breach of fiduciary duty of care.

A.      *The Complaint Exceeds Rule 8's Minimal Notice Pleading Requirements.*

Defendants move to dismiss Counts I through III on the ground that the Complaint is vague as to the role of each Loan Committee member.  Defendants claim that the "FDIC never specifies the loans that were made (or the losses that supposedly resulted) from these generally described problems.  And it never ties the alleged losses to a specific director or loan committee member." (Defs' Joint Brf., at 16.)

The Complaint shows otherwise.  The Complaint details which members of the Loan Committee personally approved each grossly negligent loan and the date of that approval.  (*See* Compl., ¶ 41.)  Then, for each loan, the Complaint identifies the specific reasons why approval of that loan was grossly negligent.  (*Id.*, *see, e.g.,* ¶¶ 51; 59; 66; 80; 87; 99.)  For example, the Complaint alleges that Spangler, Sykes, Eichas, Sundry and Maly all approved a $3.62 million loan to Galewood Plaza II, LLC in December 2007.  (*Id.*, ¶ 41.)  At the direction of these defendants, Wheatland made this non-recourse, interest-only loan to refinance a failing strip mall and raw land.  (*Id.*, ¶ 57.)  The loan was approved despite the presence of a *lis pendens* on the property that impaired the Bank's security interest.  (*Id.*, ¶ 59)  Notwithstanding the condition of the collateral, the Loan Committee Defendants approved the loan without ensuring that the borrower had the cash flow to repay the loan.  In fact, the loan was approved without obtaining current financial information from the borrower or the guarantor.  The guarantor, a major shareholder of the Bank, was only required to provide a 25 percent personal guaranty in violation of the Bank's written loan policies.  (*Id.*, ¶ 59.)  The Galewood Plaza loan also constituted a violation of Wheatland's commitment to its regulators that the Bank would limit total loans to the amount set forth in its business plan and exacerbated the already excessive concentration in CRE and ADC lending.  (*Id.*, ¶ 60.)  As a result of the Loan Committee Defendants' approval of this grossly negligent loan, Wheatland lost approximately $1.4 million.  (*Id.*, ¶ 62.)

The Complaint alleges this level of detail as to the responsibility and gross negligence of the Loan Committee Defendants for each loan that they personally approved. (*See, e.g.,* Compl., ¶¶ 51; 59; 66; 80; 87; 99.) The Loan Committee Defendants' repeated approval of risky loans without obtaining sufficient personal guarantees to protect the Bank, without investigating the borrowers or guarantors' financial condition and ability to repay the loans and without ensuring even the basic underwriting required by the Bank's loan policy is specifically pled for Counts I-III. (*Id.*, ¶¶ 120; 125; 130.)

Defendants cite no authority that dismissed such detailed claims on Rule 8 or 12(b)(6) grounds. Instead, Defendants rely on a corporate derivative case applying a heightened fact pleading standard pursuant to Federal Rule of Civil Procedure 23.1 and a summary judgment opinion that does not address pleading standards for gross negligence. *See In re ITT Corp. Derivative Litig.*, 588 F. Supp. 2d 502, 510-511 (S.D.N.Y. 2008) (unlike Rule 8, Rule 23.1 requires specific factual allegations to show demand was futile); *RTC v. Acton*, 844 F. Supp. 307, 312 (N.D. Tex. 1994) (ruling on summary judgment motion). The Complaint's allegations against the Loan Committee Defendants satisfy Rule 8.

Defendants also contend that the Complaint should separately discuss each Loan Committee Defendant, but the story is essentially the same for each of them. (Defs' Joint Brf., at 9-10.) Each Loan Committee member received the same loan approval requests showing the absence of a sufficient guarantee or collateral for distressed or underperforming properties, the high LTV ratios in contravention of prudent underwriting standards and the absence of adequate financial information regarding the borrowers and guarantors. Each Loan Committee Defendant was aware of the repeated regulatory criticisms of excessive growth, overconcentration of CRE and ADC loans and credit administration problems. Each Loan Committee Defendant was aware

13

that this was a *de novo* institution and the regulators had repeatedly urged close monitoring of the Bank's lending practices.  (Compl., ¶¶ 32-34.)  In voting for the Loss Loans, all of the Loan Committee Defendants failed to exercise the requisite care to satisfy their fiduciary duties.

B.     *The Complaint Plausibly Alleges That Approval of Each Loan Was Grossly Negligent.*

Defendants also conclusorily state that the allegations in the Complaint are "nothing but vague assertions that officers and directors did not conform to a loan policy or get a personal guarantee," and therefore do not rise to the level of gross negligence.  (Defs' Joint Brf., at 24.) But Defendants do not confront the specific factual allegations as to each loan and the reasons why the Loan Committee Defendants' approval of those loans for speculative real estate development without requiring proper underwriting was grossly negligent, particularly given the Bank's *de novo* status.[5]

Numerous courts in this district have held that comparable allegations state a claim for gross negligence.  In *RTC v. Franz*, 909 F. Supp. 1128 (N.D. Ill. 1995), for instance, the Court refused to dismiss a complaint alleging that defendants plunged their thrift into "out-of-state participation loans for" real estate development without establishing proper underwriting controls.  *Id.*, at 1130.  Similarly, in *RTC v. Keefe*, 1993 U.S. Dist. LEXIS 17701, at *2-5, the RTC alleged directors of a failed savings and loan pushed their institution into a new line of loans allowing dramatic growth and overconcentration.  Although "the Board hired someone to

---

[5]     Defendants cite *First Nat'l Bank of Lincolnwood v. Keller*, 318 F. Supp. 339, 348 (N.D. Ill. 1970) to attempt to excuse the Loan Committee Defendants' violation of the Bank's own lending policies.  But *Keller*, an opinion issued after a trial, held only that a technical violation of the loan approval process, with "little evidence offered as to the soundness of the loans to these borrowers," did not establish negligence.  The *Keller* post-trial decision has no relevance to whether the Complaint satisfies Rule 8.  Moreover, unlike in *Keller*, the Complaint identifies numerous substantive problems with these loans that should have been apparent to the Loan Committee at the time of approval.

oversee the [new] program, [it] did not require him to comply with the Board's automobile lending guidelines." *Id.* at *2 (denying motion to dismiss § 1821(k) claims); *see also RTC v. O'Connell*, No. 94 C 4186, 1996 U.S. Dist. LEXIS 3999, at *8 (N.D. Ill. Apr. 1, 1996) (denying motion to dismiss gross negligence claim against bank directors for failure to take corrective action to respond to lending problems and failing to institute proper internal controls to make prudent loans); *RTC v. Fortunato*, No. 94 C 2090, 1994 U.S. Dist. LEXIS 12326, at *8-9 (N.D. Ill. Aug. 31, 1994) (denying motion to dismiss gross negligence claim against officers and directors for failure to properly supervise and for disregarding federal directives).[6]

Defendants also attempt to excuse their gross negligence on the grounds that the Complaint is the product of hindsight and they should not be held liable as insurers for losses resulting from a recession. But no hindsight is needed to allege the Loan Committee Defendants ignored regulatory warnings against rapid growth and excessive concentration and failed to require sound underwriting procedures when approving the eight Loss Loans. Rather than attempting to hold the Loan Committee Defendants accountable for failing to foresee future economic developments, the Complaint alleges facts showing they approved these loans with patently inadequate underwriting based on the facts available at the time of approval.

---

[6] Notably, *Franz*, *Keefe*, *O'Connell*, and *Fortunato* found the RTC stated claims under § 1821(k) even when applying a stricter "gross negligence" standard than the currently accepted "very great negligence"/"less than willful, wanton and reckless" Illinois standard. *See, e.g., Gravee*, 966 F. Supp. at 636 (following *Massa*, 507 N.E.2d at 819); *O'Connell,* 1996 U.S. Dist. LEXIS 3999, at *8 (requiring "recklessness"); *Franz*, 909 F. Supp. at 1141 (requiring "recklessness"); *Fortunato*, 1994 U.S. Dist. LEXIS 12326, at *8 (requiring "willful or wanton misconduct"); *Keefe*, 1993 U.S. Dist. LEXIS 17701, at *4 (requiring "willful and deliberate acts"). Had those cases applied the standard set forth in *Gravee* and *Massa*, the sufficiency of the RTC's allegations would have been even clearer.

### C.     The Loan Committee Defendants Had a Heightened Duty of Care.

Defendants further claim that Count III for breach of fiduciary duty of care improperly holds the Loan Committee Defendants to an "utmost care" standard when "reasonable care" should control.  (*See* Defs' Joint Brf., at 14.)  As explained in Section II, attention greater than ordinary care is necessary when directors and officers are on notice of trouble in a bank's operations.  *See FDIC v. Bierman*, 2 F.3d at 1433 (holding degree of care must match the extent of the problems known to the officers and directors).

The Loan Committee Defendants should be subject to a heightened standard of care under the circumstances here.  As a newly opened bank, Wheatland was particularly susceptible to unsafe lending and credit administration practices and regulators quickly and frequently warned the Bank to closely monitor the risks.  (Compl., ¶¶ 32-35.)  Nonetheless, Wheatland's Loan Committee ignored the Bank's business plan, upon which they secured deposit insurance, and rapidly increased ADC and CRE loans in a short period of time.  Regulators warned the Defendants to reform the Bank's underwriting practices to address these excessive risks, but grossly negligent loans were still being approved as late as 2009.  Because the Loan Committee Defendants were on notice of these problems, they should be held to a higher standard of care.

Regardless, Count III states a claim for breach of fiduciary duty whether the Loan Committee Defendants are held to an "utmost" or "reasonable care" standard.  Defendants' failures, as detailed above, are not borderline judgment calls that may qualify as ordinary care; they are gross breaches of fiduciary duty stemming from a complete failure to ensure safe and sound lending practices were followed to protect the Bank and its depositors.  *See, e.g., FDIC v. Gravee*, 966 F. Supp. at 640 (denying defendants' summary judgment motion on FDIC's gross negligence claim due to concentration in risky lending and failure to observe regulatory warnings.)

16

**IV.    The Complaint Sufficiently Pleads Claims for Gross Negligence and Negligence Against the Director Defendants For Failure to Supervise the Bank's Risky Lending.**

Counts V and VI detail the Director Defendants' gross negligence and negligence in their oversight of the Bank's lending practices. The directors were placed on notice as early as 2007 by regulatory reports, as well as through the Bank's own monthly loan reports reflecting loan concentrations, liquidity analyses and ALLL data, that the Bank was overconcentrated in speculative real estate construction loans with numerous risky loans to the same borrowers. (*See* Compl., ¶ 114.) The Director Defendants were urged to closely monitor loan concentration due to the Bank's *de novo* status, rapid loan growth and the inherent risk associated with CRE and ADC lending. (*Id.*, ¶¶ 26; 33.) The Director Defendants ignored these warnings and took no remedial action to reform the underwriting and lending practices at Wheatland. Rather, they permitted management to continue to violate the approved business plan, loan policies and federal regulations. (*Id.*, ¶¶ 112.) As a result, Wheatland's risky lending operations continued unabated causing tens of millions of dollars in losses.

Defendants raise three primary objections to Counts V and VI. First, Defendants assert that the Complaint does not adequately distinguish between outside and inside directors. (Defs' Joint Brf., at 9-10.) Second, citing out of state law applying inapplicable pleading standards, Defendants contend that repeated warnings to the directors of out-of-control lending practices were not sufficiently specific or dire to state an action under Delaware oversight liability law. (*Id.*, at 23.) Finally, the Defendants contend that they reasonably relied on officers, consultants and other professionals so they cannot be held liable. None of these arguments have merit. (*Id.*, at 21-22.)

A.    *Complaint Pleads Red Flags Known to All Directors and Their Collective Failure to Supervise Risky Lending Activities.*

Defendants critique the Complaint for not separately pleading claims against inside and outside directors, but Defendants' argument is simply form over substance.  The FDIC-Receiver's Complaint does not parse out each director's knowledge because all of the Director Defendants were on notice of the Bank's risky and imprudent lending practices, and all failed to take any remedial action.  Certainly, Spangler (Chairman of the Board and Loan Committee member), Sykes (President, CEO, and Loan Committee member), Sundry (Loan Committee member) and Maly (Loan Committee member) were intimately familiar with the Bank's risky lending approach that concentrated its loans in a handful of developers and speculative CRE and ADC loans.  (Compl., ¶¶ 6-8; 10.)

The Loan Committee Director Defendants' culpability does not diminish the fiduciary duties of Rees, Davolt, Beles and Harvey (referred to as the "Outside Directors" in the Complaint) to oversee the operations of the bank.  All Directors "are charged with keeping abreast of the bank's business and exercising reasonable supervision and control over the activities of the bank."  *See Bierman*, 2 F.3d at 1433 (holding absentee directors with no knowledge of transaction still liable for failure to address risky practices).[7]  In this case, all of the inside and outside directors received monthly credit reports showing that the Bank rapidly

---

[7]    Defendants cite an FDIC Financial Institution Letter, but it does not excuse outside directors from their duty of supervision.  (*See* Defs' Joint Brf., at 10.)  First, the letter cannot be construed as a part of the pleadings under Fed. R. Civ. P. 10(c) for the purposes of a Rule 12(b)(6) motion.  *See Batteast Const. Co., Inc. v. Public Bldg. Comm'n of Chicago*, 195 F. Supp. 2d 1045, 1051 (N.D. Ill. 2001) (attachments to a motion to dismiss may only be considered part of the pleadings if central to plaintiff's claims, not defenses).  Furthermore, the letter, which describes FDIC policy on when a suit is in the public interest, states that outside directors are most commonly sued "in situations where the directors failed to heed warnings from regulators . . . that there was a significant problem with the bank that required correction." That is precisely the case here.  (Compl., ¶¶ 112-15.)

overshot its asset and loan plans soon after its inception. (*See* Compl., ¶ 114.) All of the directors received regulatory reports from the IDFPR and the FDIC warning about the Bank's "excessive growth rate, high concentration of risky CRE and ADC loans, violations of LTV ratio guidelines, and poor earnings." (*Id.*, ¶ 115.) The Board of Directors and senior officers all met with federal regulators in early 2008 to discuss the previously identified concerns. (*Id.*, ¶ 34.) And all directors had a duty to be aware that the concentration in CRE and ADC loans as a percentage of total capital widely diverged from the standards of Wheatland's peer banking institutions.[8] (*Id.*, ¶¶ 27-28.) These allegations are sufficient to demonstrate that all of the directors were on notice of the Bank's unsustainable and risky lending practices.

Defendants cite no authority dismissing claims against directors on the grounds that the complaint did not separately plead claims against inside and outside directors. Defendants point to *Washington Bancorporation* as proof that courts distinguish between inside and outside directors in "analyzing individual breach of fiduciary duty claims." (Defs' Joint Brf., at 13.) In fact, the court in *Washington Bancorporation* separately analyzed the liability of outside directors and the CEO solely for breach of contract, not the breach of fiduciary duty claim, because the CEO had an employment contract with the company, unlike the outside directors. 812 F. Supp. at 1272-73. In contrast, when analyzing the breach of fiduciary duty counts, the court in *Washington Bancorporation* addressed all the defendants, both officers and directors,

---

[8]     Defendants attached charts purporting to show Wheatland's loan concentration levels in CRE and ADC loans in response to the Complaint's graphical proof of Wheatland's rapid increase in these risky loans compared to its peer group. (*See* Defs' Joint Brf., at 17-18, n.3; Exs. C & D.) Not only is submitting competing charts inappropriate for a motion to dismiss, but the new charts do not advance the Defendants' arguments. Rather, Defendants' charts confirm that Wheatland rapidly concentrated its lending in speculative CRE and ADC loans— from $16.3 million in first quarter 2007 and to over $420 million by the third quarter 2009.

globally. *Id.* at 1271 (stating same obligation to be reasonably informed of bank's operations applied to both officers and directors).

Defendants' citation to *Ohlendorf v. Rathje* also offers no support for dismissing a claim that does not separately make allegations against each director. No. 7,061, 1923 WL 3327, at *1 (Ill. App. Ct. 1923) (reviewing a judgment, not allegations on a motion to dismiss). The court in *Ohlendorf* assessed classes of directors' knowledge of an ongoing fraud hidden from most of the bank's directors. *Id.* Unlike in *Ohlendorf*, all Defendants here, including the Outside Directors, received the same reports reflecting the Bank's inadequate underwriting and risky lending practices and were therefore on notice of those problems. *See Bierman*, 2 F.3d at 1432, 1437 (stating that "[f]ew distinctions have been drawn between the duties of inside and outside directors" and holding outside directors "shared responsibility with the insiders for the improvident loans" because they were on notice of the bank's problems). The Complaint adequately pleads gross negligence and negligence by each of the Director Defendants.

> B. *Illinois Law Applies to FDIC-Receiver's Claims For Failure to Supervise.*

Defendants misstate the law governing the FDIC-Receiver's claims for failure to supervise against the Bank's directors. Defendants repeatedly cite to Delaware law, including Illinois state and federal court opinions applying Delaware law, on claims against officers and directors of Delaware corporations. *See, e.g., Cement-Lock v. Gas Tech. Inst.*, 523 F. Supp. 2d 827, 842 (N.D. Ill. 2007) (applying Delaware law by agreement of parties to breach of fiduciary duty claims against corporate officers and directors); *Sherman v. Ryan*, 911 N.E.2d at 390 (applying Delaware law to derivative claims brought on behalf of Delaware corporation). However, Wheatland was a state nonmember bank organized under the laws of the State of Illinois. (Compl., ¶ 5.) Accordingly, Illinois law applies to the FDIC-Receiver's claims against the directors and officers of Wheatland for failure to supervise.

As described in Section II, Illinois law permits claims for both negligence and gross negligence against directors. *See RTC v. Keefe*, 1995 U.S. Dist. LEXIS 17701, at *5. To satisfy the simple negligence standard, the FDIC-Receiver need only plead that the directors failed to exercise "ordinary care and prudence" in their oversight of the Bank's lending operations. *FDIC v. Bierman*, 2 F.3d at 1432.

Gross negligence is also actionable under Illinois law. *FDIC v. Gravee*, 966 F. Supp. 622 (N.D. Ill. 1997), sets forth the controlling definition of gross negligence under Illinois law. (Defs' Joint Brf. at 24); (*see also* Davolt Br. at 3-4.) *Gravee* defined gross negligence as "very great negligence, . . . [b]ut it is something less than . . . willful, wanton and reckless conduct." 966 F. Supp. at 636. The court in *Gravee* explicitly rejected a recklessness definition of gross negligence, concluding that a showing of "utter indifference" or "conscious disregard" was not required under Illinois law. *Id*. No allegations of lack of good faith or an intent to injure are required to sustain a claim of gross negligence under Illinois law. *Id.*, at 636-37. Critically, the *Gravee* court held, in denying the directors' summary judgment motion that "a reasonable jury could find for FDIC if it concludes that . . . (the Bank's) ADC loan underwriting and monitoring practices were seriously deficient and that defendants repeatedly disregarded . . . (federal regulator's) warnings about those deficiencies." *Id*. at 640.

Contrary to established Illinois law, Defendants want this Court to adopt Delaware's scienter requirement for director oversight liability. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996). Defendants claim that the FDIC-Receiver must plead that the Director Defendants "knew they were not discharging their fiduciary duties or demonstrated a conscious disregard for their responsibilities such as by failing to act in the face of a known duty to act." (Defs' Joint Brf., at 15, citing *In re Citigroup Inc. S'holders Derivative Litig.*, 964

A.2d 106 (Del. Ch. 2009).)  However, this is not the applicable standard.  The court in *Gravee*, which all parties cited approvingly for the definition of gross negligence under Illinois law, specifically rejected such a "conscious disregard" standard for gross negligence claims against bank directors.  966 F. Supp. at 636.  That opinion made clear that bad faith was not required to plead a breach of the duty of care.  *Id*.  Defendants cite no Illinois cases applying the *Caremark* or *Citigroup* standards for an Illinois corporation under Illinois law.

      C.     *The Director Defendants Received Ample Notice Of Unsafe and Unsound Lending Practices But Failed To Act.*

Even if the FDIC-Receiver is required to meet the *Caremark* standard, the Complaint states a claim for failure to supervise.  It is well established that directors that have a duty to inform themselves regarding the material operations of the Bank and to respond to known risks and problems.  *See FDIC v. Bierman*, 2 F.3d at 1432-33.  The Complaint alleges that the directors received and failed to respond to numerous red flags and warnings, including regulatory examinations and monthly reports, showing that Wheatland was improperly concentrated in risky CRE and ADC loans, was engaged in unjustifiable loan growth and was deficient in its credit underwriting and credit administration.  (Compl., ¶¶ 32-39.)

These allegations are sufficient to state a claim both for negligence and gross negligence. *See In re Abbott Lab. Derivative S'holder Litig.*, 325 F.3d 795, 805-806 (7th Cir. 2003) (distinguishing *Caremark* where no red flags were raised to the board and reversing dismissal of claim against directors for inadequate oversight); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059-66 (C.D. Cal. 2008) (denying motion to dismiss failure of oversight claim with respect to most officers and directors due to presence of red flags in Countrywide's underwriting practices and finding "scienter" requirement satisfied); *Cement-Lock*, 523 F. Supp. 2d at 846-49 (denying summary judgment as to all director defendants on claims that directors

failed to ensure proper internal controls after red flags warned of problems). Each of these cases applied the heightened pleading requirements for a derivative claim but nonetheless denied motions to dismiss and for summary judgment regarding claims against directors for inadequate oversight. The Complaint contains comparable factual allegations that the directors disregarded repeated red flags, but is subject to far less onerous fact pleading requirements.

Director Defendants claim that the Complaint fails to identify the regulatory reports that put them on notice of the Bank's problems and they are "left to guess . . . who had access to the reports [and] when the reports were sent to the [D]efendants." (Defs' Joint Brf., at 23.) However, the Complaint pleads how all of the Director Defendants were informed of the Bank's critical failings. Specifically, the directors received "monthly reports of loans approved by the Loan Committee, loan concentrations, liquidity analyses, ALLL data, and regulatory reports and correspondence." (Compl., ¶ 114.) The Complaint also pleads that the Bank's directors received four full-scope safety and soundness examinations by regulators and an on-site FDIC visit. (*Id.*, ¶¶ 32-39.)

The Complaint further identifies the specific warnings provided in those reports that the Director Defendants utterly failed to address in contravention of their duties. Within six months of the Bank's opening, the state examiners warned the directors that, as of June 30, 2007, CRE lending represented the largest share of the Bank's loans, with a concentration exceeding 200 percent of total capital. (*Id.*, ¶ 26.) The report warned that the Bank's high concentration of these loans and the inherent associated risks required close monitoring of lending practices by the directors, particularly because the Bank was new and did not have a seasoned loan portfolio. (*Id.*, ¶ 33.) The report also warned of excessive asset growth, poor earnings and failure to

document exceptions to Bank lending policies. (*Id.*) Defendants can hardly plead ignorance regarding these reports—it was their most basic duty to be aware of these material issues.[9]

Throughout 2008 and 2009, regulators continued to warn Wheatland's directors and officers regarding the risks posed from their "underwriting and credit administration deficiencies, loan policy violations and continued excessive growth rate." (Compl., ¶ 34.) Following up on the February 2008 Report on Examination, the FDIC examiners met with the Board of Directors and senior officers in April 2008 to discuss these concerns. (*Id.*) An August 2008 on-site visit and February 2009 Report on Examination both raised the same red flags. (*Id.*, ¶¶ 35-36.) Based on these detailed allegations, it is hard to understand the Defendants' claim that they have to guess as to the nature of their failings.

In an attempt to argue the merits of the case, Defendants selectively quote the lengthy Office of Inspector General's Report ("OIG Report") on the failure of Wheatland. *See* FDIC, Office of Inspector General, Report No. IDR-11-005, *In-Depth Review of the Failure of Wheatland Bank, Naperville, Illinois* (January 2011), *available at* http://www.fdicoig.gov/reports11%5C11-005IR.pdf. Defendants contend that the OIG Report contrasts with the "dire picture" that the FDIC-Receiver alleges in the Complaint. (Defs' Joint Brf., at 20-21, n.5.) While it is not appropriate to introduce the OIG Report in support of a motion to dismiss, it is an odd choice to cite to a document so supportive of the allegations in the

---

[9]        Davolt claims that the FDIC has not sufficiently alleged that she received notice of or reviewed any communications from the regulators. (Davolt Brf., at 9-10.) But these reports of examination are issued to the Board by regulators and Davolt cannot deny that she was a member of the Board or that she attended the April 2008 meeting with federal regulators— there is no deficiency in alleging notice to her. Also, Davolt's suggestion that she might never have read the regulator's reports highlighting material problems at Wheatland certainly does not excuse her from this claim for gross negligence. *See Atherton v. Anderson*, 99 F.2d 883, 891 (6th Cir. 1938) (failure to read reports does not insulate director from liability.); *FDIC v. Brickner*, 747 F.2d 1198, 1202 (8th Cir. 1984) (bank directors could not ignore bank examiner warnings).

Complaint. For example, the following is the OIG's summary of the "Causes of Failure and Loss" for Wheatland:

> Wheatland's failure can be attributed to the Board of Directors' (Board) and management's aggressive growth strategy for a de novo institution—funded by volatile, high-rate deposits—that led to high CRE and ADC loan concentrations. Overall, management and the Board failed to establish appropriate practices to mitigate the risk associated with this strategy. Weak credit administration practices along with continued aggressive growth in a deteriorating economy contributed to a precipitous deterioration in asset quality and, ultimately, poor earnings and insufficient liquidity and capital. The Board and Bank management failed to address regulatory warnings regarding excessive growth, insufficient staffing, asset quality deterioration, and a lack of risk diversification. Disagreements among members of the Board and Bank management were in part to blame for the Bank's failure to implement timely corrective action to resolve these issues.

OIG Report, at 2. The OIG's conclusion that the directors and management failed to institute internal controls to control Wheatland's risky lending or to "address regulatory warnings regarding excessive growth . . . asset quality deterioration and a lack of risk diversification" strongly supports the FDIC-Receiver's claims that the Directors Defendants were grossly negligent for failure to supervise.

>    D.    *The Director Defendants Cannot Excuse Their Failure to Supervise By Claiming Reliance on Management and Consultants.*

The Illinois Banking Act does not absolve Wheatland's directors of their duty to address known underwriting problems and risky loan concentrations. The Director Defendants rely on 205 ILCS § 5/16(7)(b) (2001) for the proposition that directors can rely on financial information and other data provided by bank employees or outside consultants. (Defs' Joint Brf., at 21-22; Davolt Brf., at 8.) Defendants, without any citation, make improper factual assertions about outside auditors and professionals that worked with Wheatland during its brief operations. (Defs' Joint Brf., at 22.)

Defendants' argument that they relied on financial information from the Bank's officers is no help to them. This is not a case where the FDIC-Receiver alleges bank directors failed to appropriately question the accuracy of financial data received from bank employees. (*See* Davolt Brf. at 6, 8 (raising non-responsive argument that she had no basis to doubt information received from officers).) Here, the Director Defendants received information from both their officers (monthly loan reports) and regulators indicating that the Bank's lending practices were inadequate and exposing Wheatland to excessive risk. Despite these warnings, Wheatland's directors did not reform the Bank's underwriting procedures and limit risky lending. (Compl., ¶ 140.) The allegations in the Complaint properly state a claim for both gross negligence (Count V) and negligence (Count VI) for failure to supervise.

**V.     The Loan Committee Defendants' Approval of Preferential Loans to Bank Shareholders, Against the Best Interests of Wheatland, Breached Their Fiduciary Duty of Loyalty.**

The Loan Committee Defendants gave preferential loans to Bank shareholders on terms and conditions contrary to the best interests of Wheatland. Seven of the Loss Loans ("Insider Loans") were made to favored shareholders and borrowers. (Compl., ¶¶ 132-36.) The Loan Committee Defendants extended these loans to borrowers who were not creditworthy or were in financial difficulty, and approved loans for projects that were not financially feasible. (*Id.*, ¶ 45.) Notwithstanding the borrowers' deficiencies, the Loan Committee Defendants approved these Insider Loans with partial or no guarantees, with LTV ratios in excess of federal guidelines and the Bank's loan policy, and/or without obtaining an appraisal or adequate collateral. (*Id.*, ¶ 45.) No outside borrower could have received those terms. The Loan Committee Defendants failed to pursue the favored borrowers after they defaulted on these loans and even granted continuing concessions at the further expense of the Bank's interests. (*Id.*, ¶¶ 6-11; 44-45; 48-83; 94-111; 135.) Defendants' actions in approving these loans depleted the Bank's capital and contributed

to the Bank's closure after only three years in business. (*Id.*, ¶¶ 24-25; 43-47; 135-36.) By approving these loans and then permitting the Bank to forego its collection rights against these preferred borrowers after they defaulted, the Loan Committee Defendants, as officers and directors of Wheatland, breached their duty of loyalty. (*Id.*, ¶¶ 134-35).

Relying principally on Delaware law, Defendants maintain that a claim for breach of the duty of loyalty can only be maintained when the wrongdoer personally benefits from his conduct. However, Illinois law permits a claim for breach of the duty of loyalty when it hinders the entity's continued operations, even if the wrongdoer does not derive a personal benefit. *See, e.g., Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 415 n.14 (N.D. Ill. 2001) (noting that in Illinois, "[c]orporate officers owe a fiduciary duty of loyalty to their corporate employer not to actively exploit their positions within the corporation for their own personal benefit or hinder the ability of a corporation to continue the business for which it was developed. . ."); *see also Velo Corp. v. Babcock*, 611 N.E.2d 1054, 1059 (Ill. App. Ct. 1993) (same). Illinois courts specifically have found breaches of the duty of loyalty when directors approved preferred loans to shareholders, even when they did not personally profit. *See Romanik v. Lurie Home Supply Ctr., Inc.*, 435 N.E.2d 712, 722-23 (Ill. App. Ct. 1982) (affirming finding of breach of fiduciary duty against directors that approved below market rate on notes with inadequate security for benefit of majority shareholder); *see also Maercker Point Villas Condo. Assoc. v. Szymski*, 655 N.E.2d 1192, 1194-95 (Ill. App. Ct. 1995) (affirming breach of duty of loyalty for hindering corporation's continued operation). Contrary to Defendants' contention, Count IV alleges not simply inadequate job performance, but rather affirmatively disloyal conduct that placed outside interests ahead of those of the Bank and hindered its continued operations by

depleting its capital. The Complaint adequately states a claim for breach of the duty of loyalty against the Loan Committee Defendants.[10]

## VI. Proximate Cause Has Been Sufficiently Alleged for Every Loss Loan.

The Complaint satisfies the requirements for pleading proximate cause. FDIC-Receiver alleges the Loss Loans were imprudent at the time they were made and that if the Defendants had exercised the proper care, these loans would never have been approved and the consequent losses to Wheatland avoided. (*See* Compl., ¶¶ 40-115.)

### A. Proximate Cause is a Fact Issue Inappropriate for Disposition on a Motion to Dismiss.

Defendants' request that this Court make a factual judgment whether the Defendants' actions and inactions proximately caused Wheatland's losses is improper on a motion to dismiss. Proximate cause is a fact-specific question and not an appropriate basis for a motion to dismiss. *See FDIC v. Miller,* 781 F. Supp. 1271, 1278 n.5 (N.D. Ill. 1991) (proximate cause "concern[s] factual disputes not ripe for resolution in a motion to dismiss"); *Palay v. U.S.*, 349 F.3d 418, 432-33 (7th Cir. 2003) ("Whether or not the defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law."). "It has long been the law in Illinois and elsewhere that proximate cause is preeminently an issue of fact to be decided by the jury." *Rivera v. Garcia*, 927 N.E.2d 1235, 1242 (Ill. App. Ct. 2010).

---

[10]     Defendants weakly assert it is illogical to apply the duty of loyalty to loans to shareholders because shareholders would have no incentive to accept excessively risky loans that might cause the Bank to fail and undercut their own investment. (*See* Defs' Joint Brf., at 28-29.) Of course, the total loan amounts received by these preferred shareholders far exceeded the borrowers' investment in the Bank. For example, Charles Markopolous received Wheatland loans in excess of $23 million dollars and the Gannett family received total loans of in excess of $27 million dollars. (*Id.*, ¶¶ 41; 64; 83.)

      B.     *The Complaint Alleges Sufficient Facts, Known at the Time the Loss Loans were Approved, to Demonstrate Proximate Cause.*

In any event, the Complaint alleges specific facts, existing at the time each Loss Loan was made and known to the Defendants, to sufficiently plead proximate cause for the purposes of Rule 8.  Far from building a case on hindsight, the Complaint sets out how Defendants were repeatedly advised of the very problems that would eventually force the Bank's closure and, despite those warnings, Defendants never addressed these major problems and continued to make excessively risky loans, such as the Loss Loans.  (Compl., ¶¶ 4; 32-39; 115.)

For example, the Complaint alleges that the Lakemill Plaza, LLC Loan, a $10.6 million dollar loan, was approved by the Loan Committee without an adequate investigation into the repayment ability of borrower Charles Markopolous.  (*Id.*, ¶¶ 41; 80.)  The Loan Committee extended this loan to Markopolous, who controlled 100,000 shares of Wheatland stock, despite an LTV ratio on the distressed retail property of 140 percent and the Loan Committee's own express acknowledgement at the time it approved this loan that the Lakemill Plaza loan caused the Bank to exceed its internal lending limit for Markopolous.  (*Id.*, ¶¶ 78-79.)  Despite the fact that this loan was in violation of Bank loan policy and regulatory guidelines, the Loan Committee Defendants approved it with only a 25 percent guarantee, which itself violated prudent underwriting standards and the Bank's loan policy.  (*Id.*, ¶ 80.)  The Lakeland Plaza loan defaulted after the interest reserve was depleted, yet Defendants never pursued Markopolous on his guarantee.  (*Id.*, ¶ 81.)  These failures resulted in an estimated loss of $4.4 million to Wheatland.  (*Id.*, ¶ 41.)  This loan would not have been made had safe and sound lending practices and the Bank's business plan been followed.

Defendants also assert that they could not have foreseen the economic downtown of the past few years and therefore FDIC-Receiver has not properly pled proximate cause.  (Defs' Joint

Brf., at 26.) "Such an argument ignores the point that a proximate cause need not be the only cause; it need only be a substantial factor leading to the injury, not the sole factor." *Bierman*, 2 F.3d at 1434 (rejecting defendant-directors argument that the poor farm economy in Indiana was the proximate cause of the Bank's loan losses). In fact, more than one proximate cause can exist for a loss or injury under Illinois law. *Nobles v. White Cnty.,* 973 F.2d 544, 549 (7th Cir. 1992). Such questions cannot be resolved on a motion to dismiss. Defendants' proximate cause challenge must fail.

## VII. Business Judgment Rule Does Not Bar The FDIC-Receiver's Claims for Gross Negligence, Negligence and Breach of Fiduciary Duties.

The business judgment rule does not bar the FDIC-Receiver's claims for gross negligence, negligence and breach of fiduciary duty. Federal courts do not require plaintiffs to defeat the defense of business judgment at the pleading stage. The business judgment rule also does not apply here because the Complaint alleges that the directors and officers were not diligent in performing their duties. Therefore, Defendants are not entitled to its protections.

### A. The Business Judgment Rule is a Fact Intensive Inquiry Ill Suited to Resolution on a Motion to Dismiss.

Federal courts routinely deny motions to dismiss based on the business judgment rule because Rule 8 does not require fact pleading to defeat such a defense. Whether the business judgment rule applies is typically a fact intensive inquiry that cannot be resolved on a motion to dismiss. *See Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 556-57 (D. Del. 2008) ("Generally speaking, [the court] will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)."); *In re Fleming Packaging Corp.*, 370 B.R. 774, 786-87 (Bankr. C.D. Ill. July 11, 2007) (holding plaintiff does not need to rebut business judgment rule at pleading stage of claims against corporate directors); *RTC v. Lucas, et al.*, No. 92-1317, 1993 U.S. Dist. LEXIS 9892, at

*14-16 (C.D. Ill. Mar. 25, 1993) (rejecting business judgment rule argument on motion to dismiss because federal pleading standards only required notice pleading).

Tellingly, Defendants cite no Illinois federal decisions resolving a business judgment argument at the motion to dismiss stage. (*See* Defs' Joint Brf., at 11-12.) Instead, Defendants cite a summary judgment opinion evaluating the business judgment rule after the evidence has been presented and state court cases that apply a heightened fact pleading standard inapplicable in federal court. *See, e.g., Talton v. Unisource Network Servs., Inc.,* No. 00 C 7967, 2004 WL 2191605, at *14-15 (N.D. Ill. 2004) (partly denying summary judgment on fiduciary duty claim due to factual dispute over whether directors exercised due care); *Stamp v. Touche Ross & Co.*, 636 N.E.2d at 622-24 (applying state fact pleading requirements and granting leave to amend to plead claim overcoming business judgment rule).

Defendants wrongly assert that federal courts routinely apply the business judgment rule at the pleading stage, relying on *In re 1st Rochdale Co-Op Group, Ltd.*, No. 07 Civ. 7852 (DC), 2008 WL 170410, at *3 (S.D.N.Y. Jan. 17, 2008). (*See* Defs' Joint Brf., at 12, n.2.) In *Rochdale*, the district court partly granted and partly denied a motion to dismiss two breach of fiduciary duty counts. The court refused to dismiss the claim that the directors and officers failed to exercise due care in the management of the company, holding that allegation sufficient to "render plausible its argument that the Movants are *not* entitled to the protection of the business judgment rule." *Id.*, at *2 (italics added). In contrast, the court dismissed a claim that certain directors received bonuses while the company was insolvent because plaintiff did not allege a failure of the duty of care or intentional wrongdoing so the business judgment rule defense was apparent on the face of the complaint. *Id.* at *3. *Rochdale* is entirely consistent with the above authority holding that the application of the business judgment rule generally

cannot be resolved on a motion to dismiss because factual issues regarding Defendants' conduct must be addressed first.

> B.   *In Any Event, The Complaint Pleads Lack of Due Care Defeating The Business Judgment Rule At The Motion to Dismiss Stage.*

The business judgment rule does not apply in this case because the Complaint pleads lack of due care.  As described in detail in Sections III and IV, Wheatland's officers and directors disregarded regulatory warnings of unsafe lending practices, and monthly reports reflecting dangerous loan concentration and excessive growth, failed to follow the Bank's business plans and loan policies and took no action to reform underwriting practices in response to criticism. Defendants' failure to exercise due care cannot be excused by the business judgment rule.  It is a "prerequisite to the application of the business judgment rule that the directors exercise due care in carrying out their corporate duties.  If directors fail to exercise due care, then they may not use the business judgment rule as a shield to their conduct."  *Davis v. Dyson*, 900 N.E.2d 698, 714 (Ill. App. Ct. 2008) (distinguishing *Stamp* because allegations of lack of due care were sufficient to deny motion to dismiss based on business judgment rule); *RTC  v. Lucas*, 1993 U.S. Dist. LEXIS 9892, at *15-16 (holding allegation that due care was not exercised sufficient to overcome business judgment rule at pleading stage and distinguishing *Stamp* on those grounds). Defendants' own authority recognizes that allegations of lack of due care are sufficient to defeat the business judgment rule.  *See Stamp*, 636 N.E.2d at 622 (noting that "[n]owhere in the complaint does plaintiff allege that defendants did not make informed judgments or use due care in arriving at those judgments.")[11]

---

[11]   The business judgment rule is also inapplicable to claims of breach of the duty of loyalty.  *See Seidel v. Byron*, 405 B.R. 277, 290 (N.D. Ill. 2009) (noting breaches of the duty of loyalty, good faith and due care are not protected by the business judgment rule).

**VIII.    The Breach of Fiduciary Duty Claim is Not Duplicative.**

FDIC-Receiver's breach of fiduciary duty of care claim (Count III) is not duplicative of its negligent approval of the Loss Loans claim (Count II).  *See Kinzer v. City of Chicago*, 539 N.E.2d 1216, 1220 (Ill. 1989) (under Illinois law, a suit for breach of fiduciary duty is controlled by the substantive laws of agency, contract and equity rather than tort); *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1337 (7th Cir. 1992) ("[In *Kinzer*, the Illinois Supreme Court] rejected the Restatement (Second) of Torts' view that breach of fiduciary duty is a tort.").

Nor do the cases cited by Defendants provide that, under Illinois law, fiduciary duty and negligence may not be pleaded in the same complaint.  *See, e.g., Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (affirming district court's dismissal of fiduciary duty and negligence claims under the same Wisconsin statute of limitations); *Neade v. Portes*, 739 N.E.2d 496, 500-502 (Ill. 2000) (dismissing physician fiduciary duty claim: never before acknowledged cause of action contained same operative facts, injury, and damages as negligence claim).  In fact, federal courts in this Circuit have refused to apply *Neade* to dismiss a fiduciary duty claim as duplicative of a negligence claim.  *See In re Odeh*, 431 B.R. 807, 812-13 (N.D. Ill. 2010) (qualitatively different claims); *Dahlin v. Evangelical Child & Family Agency*, No. 01 C 1182, 2002 WL 31557625, at *1-2 (N.D. Ill. Nov. 15, 2002) (different standards of care possible); *Beavers v. Walsh*, No. 06-2121, 2007 WL 2681098, at *7 (C.D. Ill. Aug. 27, 2007) (potential damages significantly different).

Contrary to Defendants' broad assertion, courts do not necessarily dismiss fiduciary duty and negligence claims when pled together.  *See, e.g., RTC v. Keefe*, 1993 U.S. Dist. LEXIS 17701, at *9 - *10 (allowing breach of fiduciary duty and negligence claims against former S&L directors and officers); *RTC v. Lucas*, 1993 U.S. Dist. LEXIS 9892, at *22 (allowing breach of fiduciary duty and negligence claims against former S&L directors and officers).  Finally, even if

these two claims were duplicative, the FDIC-Receiver is free to plead them in the alternative under Fed. R. Civ. P. 8(d)(2). *See* FED. R. CIV. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.").

## IX.     The Narrow Illinois Banking Act Exemption for Director Liability Does Not Shield Defendants From FDIC-Receiver's Claims.

It is well established under Illinois law that directors may be held liable for a breach of their fiduciary duties when they fail to exercise ordinary care and prudence in administering the affairs of the bank. *See Murphy v. Candor*, No. 8,289, 1931 WL 3142, at *3 (Ill. App. Ct. 1931) ("it cannot be said that this court holds that directors of a bank, or any other corporation, can negligently manage their company and escape liability to the company, and through it, to its stockholders"); *Chicago Title & Trust Co. v. Munday*, 131 N.E. 103, 105 (Ill. 1921) ("directors must exercise ordinary care and prudence in the administration of the affairs of a bank, . . . this includes something more than officiating as figureheads"). In narrow circumstances, the Illinois Banking Act allows shareholders, by a two-thirds majority vote, to limit their directors' personal liability for monetary damages for a breach of fiduciary duty. 205 ILCS § 5/39(b) (2000). However, far from the all-purpose shield as defined by Defendants, the Illinois Banking Act exemption, even if properly invoked, would have limited application to the Complaint.

### A.     *The Illinois Banking Act Exemption Does Not Apply to Gross Negligence or Breach of the Duty of Loyalty.*

Section 5/39(b) contains numerous specific exceptions to shareholders' ability to limit a director's exposure. 205 ILCS §§ 5/39(b)(1-5). A director may not be insulated against "an act or omission that is grossly negligent" (§ 5/39(b)(1)), "a breach of the duty of loyalty to the bank or its shareholders" (§ 5/39(b)(2)), intentional or knowing misconduct (§ 5/39(b)(3)), or "a transaction from which the director derived an improper personal benefit" (§ 5/39(b)(4)).

34

Similarly, shareholders may not limit a director's liability for acts occurring before the effective date of the limiting provision. (§ 5/39(b)(5)).

Defendants cannot dispute that Counts I and V (gross negligence) and Count IV (breach of the duty of loyalty) clearly fall into the categories of claims against which shareholders may not shield a director. *See* §§ 5/39(b)(1) & (2). The Illinois Banking Act exemption does not impact those three counts.

B.      *The Illinois Banking Act Exemption Is Limited To Directors Acting Solely in Their Capacity as Directors of Wheatland.*

By its own terms, Section 5/39(b) applies solely to the actions of directors. The Banking Act defines directors' and officers' liabilities broadly, but specifies that only directors' potential liability may be limited. *Compare* 205 ILCS § 5/39(b) ("a State bank may establish that a director is not personally liable to the bank or its shareholders for monetary damages for a breach of the director's fiduciary duty"), *with* 205 ILCS § 5/39(a) (applying to "[e]very director or officer of a State bank").

Defendants attach documents purporting to show that at some time Wheatland shareholders approved a limitation of director liability. (*See* Defs' Joint Brf., Exs. A & B; Davolt Brf., Exs. A & B.) Those documents explain that "the [director liability limitation] provision does not apply . . . to persons who are officers as well as directors when acting in their capacities as officers." (*See* Defs' Joint Brf., Ex. B, at 2.) Defendants Sykes, Eichas, and Ritter were unquestionably officers of the Bank. (Compl., ¶¶ 9; 11.) Because these Defendants were acting in their capacity as Wheatland officers in approving the Loss Loans, the Illinois Banking Act exemption does not protect them from monetary liability. In fact, the exemption does not apply to the actions of any Loan Committee member. The Loan Committee was not a committee

of the Board of Directors and the actions taken by the members of the Loan Committee are not insulated from liability by the Illinois Banking Act exemption.

C.    *Defendants Have Not Met Their Burden to Show When the Claimed Exemption Went Into Effect.*

Defendants have not even met their burden to show this purported limitation was approved by a two-thirds vote of the outstanding shares of stock, as required by the statute. *See* 205 ILCS § 5/39(b) ("By the affirmative vote of the holders of at least two-thirds of the outstanding shares of stock of a State bank . . ."); *Gould Elec. Inc. v. United States*, 220 F.3d 169, 178 (3rd Cir. 2000) (on a Rule 12(b)(6) motion, defendant bears the burden to show no claim has been stated).

Defendants append two incomplete documents to their Joint Motion: the first is comprised of two pages from a Wheatland Offering Circular with an anticipated closing date of December 1, 2006 (Defs' Joint Brf., Ex. A); the second, two pages from another Offering Circular, dated August 30, 2007 (Defs' Joint Brf., Ex. B).[12]  The first Circular proposes a limitation on director liability based on the Illinois Banking Act. (*Id.*, Ex. A, p. 2.)  The second Circular merely recites that, "[t]he Bank's shareholders have adopted this provision limiting director liability." (*Id.*, Ex. B, p. 2.)  Neither of these letters demonstrate the required two-thirds vote of the outstanding shares of stock that would validate such an exception. *See* 205 ILCS § 5/39(b).

---

[12]    Defendants assert these documents are properly considered on a motion to dismiss because they establish the standard of care under Illinois law, citing *Hecker v. Deere & Co*., 556 F.3d 575, 582-83 (7th Cir. 2009) (documents specifically referenced in the complaint and "central" to plaintiff's claims properly considered on a motion to dismiss).  Section 5/39 does not modify the standard of care for director and officer liability and it is inappropriate to consider these inconclusive documents in support of a motion to dismiss. *See* 205 ILCS § 5/39(b); *Bierman*, 2 F.3d at 1433.

And even if it is assumed that two-thirds of the Wheatland shareholders approved this limitation, Defendants have not established when this exemption took effect. Pursuant to 205 ILCS § 5/39(b)(5), shareholders "may not eliminate or limit the liability of a director for . . . [a]n act or omission occurring before the effective date of the provision authorized by this subsection." According to Exhibit B, the shareholders adopted the provision limiting director liability sometime prior to August 30, 2007. (Defs' Joint Brf., Exs. A & B.) One of the largest Loss Loans in this case, the 2339-59 N. Seeley LLC Loan, was approved on April 25, 2007. (Compl., ¶ 41.)

D. *Section 5/39(b) Does Not Apply to Claims Brought by FDIC-Receiver.*

In any event, Section 5/39(b) does not apply to claims brought by the FDIC acting in its capacity as Receiver for Wheatland. Section 5/39(b) allows bank shareholders to insulate their directors against the shareholders' own right to recover against them. This kind of exemption limits their personal exposure while shifting risk to the bank and the shareholders. However, as the Defendants' attachments make clear, this provision does not apply to claims made against directors by third parties. Once a bank becomes insolvent, the FDIC-Receiver succeeds to more than the rights of the Bank. By operation of law, the FDIC-Receiver succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution." 12 U.S.C. § 1821(d)(2)(A). The third parties represented by the FDIC-Receiver did not agree to such a limitation and should not be made to bear the cost of such a self-protecting mechanism.

Furthermore, federal law charges the FDIC-Receiver with collecting the assets of the failed bank for the benefit of third parties and paying out the assets according to an established statutory scheme. *See* 12 U.S.C. §§ 1821(d)(10) & (d)(11). To the extent insulation under Section 5/39 survives after a bank fails, it should apply only to claims against the bank's estate

by the shareholders who voted to insulate the directors—the very last in the line of priority established by Section 1821(d)(11)(A)(v).

Finally, the case law in analogous contexts supports the FDIC-Receiver's position that this exemption does not apply to receivership actions. The case law demonstrates that receivers acting pursuant to comprehensive regulatory schemes designed to serve the public interest are not subject to defenses that, like the insulating statute, would unreasonably or inequitably bar recovery of what have become public losses. In *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995), for instance, the court rejected a law firm's equitable defenses to a suit brought by the FDIC as receiver:

> While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law. . . . [T]he receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets.

*Id.* at 19.

Similarly, the Illinois Court of Appeals held that an accounting firm could not impute an insolvent insurance company's wrongdoing to the Illinois Insurance Director when he was acting as the company's statutorily appointed liquidator. *See McRaith v. BDO Seidman, LLP*, 909 N.E.2d 310, 336-37 (Ill. App. Ct. 2009). The court explained "[t]his decision is supported by Illinois law and public policy that vests the Liquidator with the statutory authority to liquidate the property, business and affairs of the insolvent insurance company in order to protect policyholders and creditors from the type of misconduct which occurred here." *Id.*; *see also Cordial v. Ernst & Young*, 483 S.E.2d 248, 257 n.9 (W. Va. 1996) (rejecting argument that

38

insurance company receiver's rights "rise no higher than those of the corporations they represent" because receiver "vindicat[es] the rights of the public, including the [company's] creditors, policyholders, providers, members and subscribers"); *LeBlanc v. Bernard*, 554 So.2d 1378, 1381 (La. Ct. App. 1989) (trial court erred "as a matter of law" by placing insurance company rehabilitator "in the exact shoes" of company; insurance industry is "affected with the public interest" and rehabilitator or liquidator "owes an overriding duty to the people of State").

The only cases any Director Defendant cites in arguing for application of § 5/39(b) arose outside the receivership context, and thus do not support subjecting the FDIC-Receiver to any insulation agreement here. (*See* Defs' Joint Brf. at 6-8.) In fact, one of those cases expressly recognizes that agreements to limit liability are construed more narrowly "in contracts involving publicly regulated activities." *Cat Iron, Inc. v. Bodine Env. Servs., Inc.*, No. 10-CV-2102, 2010 U.S. Dist. LEXIS 102191 at *6-7 (C.D. Ill. Sept. 28, 2010) ("Illinois Supreme Court decisions have consistently reflected a judicial concern with balancing the need to respect the right to freely contract with the need to protect parties from unfair provisions in contracts involving publicly regulated activities."). Unquestionably, banking is a "publicly regulated" activity and insulating the Director Defendants from liability to the FDIC-Receiver based on an agreement purportedly approved solely by the shareholders would be fundamentally "unfair." *Id.* For all these reasons, the application of the Section 5/39(b) exemption to the FDIC-Receiver here is inappropriate.

## CONCLUSION

For the foregoing reasons, Plaintiff FDIC-Receiver respectfully requests that the Court deny Defendant Davolt's Motion to Dismiss and the Joint Defendants' Motion to Dismiss the First Amended Complaint in their entirety.[13]

Dated:  August 22, 2011

Respectfully submitted,

/s/ Antony S. Burt
Ronald S. Safer
Antony S. Burt
Lawrence H. Heftman
Willoughby Anderson

SCHIFF HARDIN LLP
233 S. Wacker Dr., Suite 6600
Chicago, IL 60606
(312) 258-5500
(312) 258-5600 (fax)

*Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for Wheatland Bank*

---

[13] To the extent Court determines that any portion of the FDIC-Receiver's Complaint requires additional factual explanation, the FDIC-Receiver requests leave to replead. *See Foman v. Davis,* 371 U.S. 178, 182 (1962) ("leave to amend shall be freely given when justice so requires").  This is the first complaint filed by the FDIC-Receiver and the first motion addressed to the Complaint.

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney hereby certifies that on August 22, 2011, he caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which shall send notification of such filing to all counsel of record.

/s/ Antony S. Burt
Antony S. Burt